Donna **FLANAGAN**, Individually and as Parent and Next Friend of Ashley Flanagan

v.

Conrad **WESSELHOEFT**, M.D.

No. 99–121–Appeal.

Supreme Court of Rhode Island.

Feb. 5, 2001.

Steven Aaron Robinson, Providence, for
Plaintiff.

Timothy P. Gallogly, David W. Carroll, Providence, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

Weisberger, Chief Justice.

This case is now before the Court for the second time. On August 30, 1989, Donna Flanagan (Donna), brought her daughter, Ashley Flanagan (Ashley or daughter), then eleven months old, to Dr. Conrad Wesselhoeft (Dr. Wesselhoeft or defendant), a surgeon, for a consultation in respect to an enlarged cervical node below her right ear. She brought Ashley to Dr. Wesselhoeft on the recommendation of her pediatrician, Dr. Bickford Lang. Doctor Wesselhoeft met with Donna and Ashley for approximately five to six minutes in his office. He examined the child, palpated the node, and informed Donna that the node would have to be removed by excision and then submitted to a biopsy.

The procedural history of this case is set forth in *Flanagan v. Wesselhoeft*, 712 A.2d 365 (R.I.1998) (*Flanagan I* ). In that case, we reviewed a judgment as a matter of law that had been entered in the Superior Court in favor of Dr. Wesselhoeft in an action for malpractice brought by Donna and John Flanagan (the Flanagans) to recover for injuries to their daughter, which had allegedly occurred as a result of surgery performed by defendant. We reversed the judgment of the Superior Court and remanded the case for a new trial on the factual issues raised by the evidence presented at the first trial in respect to negligence and also in respect to the issue of informed consent. Upon remand, a trial was held in the Superior Court before a jury. This trial resulted in a judgment for plaintiffs in the total sum of $209,446 in favor of the child and $41,889 in favor of the mother, for consequential damages, in-

cluding interest. In the second action the mother's name had been modified to Donna Flanagan–Jacobson or Donna Jacobson.[1] The defendant has appealed from this judgment. We deny and dismiss the appeal and affirm the judgment of the Superior Court. The facts of the case insofar as pertinent to this appeal are as follows.

At the original meeting with Dr. Wesselhoeft, there was no discussion concerning any treatment other than surgery. The only risks that were discussed in relation to the surgery were the possibility of bleeding and infection. Doctor Wesselhoeft did not discuss the likelihood that the node was malignant. He did state that the only way to find out was to remove it surgically. The surgery took place on September 27, 1989. Between the date of the first consultation and the surgery, no further discussion took place. The surgical procedure performed by defendant was completed within a period of approximately six minutes.

About one month after the completion of the surgery, Donna observed that Ashley's shoulders were uneven. It appeared that her right shoulder seemed to droop and her right scapula protruded from her back. This was a condition later described as "winging." Donna consulted with several doctors, at least one of whom performed extensive tests upon Ashley. Her condition was diagnosed as a probable severed spinal accessory nerve in the area of her neck.

Donna then brought her daughter to Dr. Melvin Rosenwasser (Dr. Rosenwasser), who did exploratory surgery and confirmed that the child's spinal accessory nerve had been severed in the course of the previous surgery done by Dr. Wesselhoeft. Doctor Rosenwasser was able to locate the severed nerve endings, which had become embedded in scar tissue. He was able successfully to reconnect the severed nerve endings, thereby permitting

---

1. Donna Flanagan divorced John Flanagan and remarried in 1996.

the spinal accessory nerve to come into apposition without tension.

A biopsy of the node earlier removed by Dr. Wesselhoeft, revealed the lymph node to be normal. No sign of malignancy was revealed. After Ashley's discharge from Dr. Rosenwasser's care, she was required to wear a neck collar, ace wrappings around her stomach area and along her chest, and a right arm brace and sling that held and confined her arm against her chest. She was relieved of her arm sling by July 1990; by September 1990, Ashley was freed from her body wrappings; and in October 1990, Ashley's neck collar was removed as well. It was established before our opinion in *Flanagan I* that Ashley had fully recovered.

On September 24, 1992, the Flanagans filed their medical malpractice claim against Dr. Wesselhoeft, as well as against a resident physician employed by Rhode Island Hospital and also against the Hospital itself. The claims against the resident physician and Rhode Island Hospital were resolved before *Flanagan I*.

This case was retried in the Superior Court and resulted in a judgment in favor of plaintiffs on November 10, 1998. During the course of the trial, portions of a videotaped deposition of Dr. Theodore Brand (Dr. Brand), a board-certified pediatric surgeon from Atlanta, Georgia, were played. He testified that Dr. Wesselhoeft had failed to meet the standard of skill and care that would ordinarily be applied by a surgeon in operating in the area where the benign node was excised. Doctor Brand, whose testimony was excluded from the first trial, also testified that he would have discussed with the parents the risk of nerve damage related to lymph node excision in the posterior triangle of the neck. He also would have discussed the practical alternatives to the proposed operation and what the prognosis or future medical condition might be had the procedure not been performed.

A motion for a new trial was denied on November 25, 1998, but on that same date a motion to amend the judgment was granted and interest in the case was recomputed. The defendant filed a timely notice of appeal. In support of his appeal, Dr. Wesselhoeft raises three issues that will be considered in the order of their importance to this opinion. The plaintiffs filed a cross-appeal, challenging the constitutionality of the Rhode Island statute governing the computation of interest in medical malpractice actions. Facts are supplied as necessary to deal with the issues raised by the parties.

## I

### Informed Consent

■ ■ The defendant contends that the trial justice committed reversible error in refusing to allow counsel to question Donna about whether she would have consented to surgery, even if she had been informed of all the material risks, and also by failing to grant Dr. Wesselhoeft's Super. R. Civ. P. 50 motion for judgment as a matter of law.

During the course of the trial, Donna testified that had she been informed of the risk of injury to the spinal accessory nerve and had she been apprised of the alternatives, such as observation and/or a needle biopsy, she would have declined to authorize the excision of the enlarged node. It is undisputed and also set forth in *Flanagan I* that the parents were never warned of any risks other than bleeding and infection. The defendant points out in his brief that he left it to the anesthesiologist to discuss the risks of brain damage and death. Donna, nevertheless, chose to have Ashley undergo the surgery.

By carefully worded questions, counsel for defendant sought to have Donna admit that had she been warned of the 1 percent possibility of damage to the accessory nerve and the possibility of malignancy that she nevertheless would have authorized the operation. The trial justice sustained several objections to these ques-

tions on the ground that they assumed facts not in evidence and further on the ground that defendant never had any significant conversation with Donna about risks and medical alternatives in respect to the accessory nerve and/or the possibility of malignancy in the enlarged node.

The trial justice permitted a number of questions on the issue of informed consent. Nevertheless, he sustained a number of objections because of the unduly repetitious nature of the questions. Counsel for defendant utilized in cross-examination portions of a deposition given by Donna before trial, as well as portions of the trial transcript from *Flanagan I.* There is no doubt that a number of questions were permitted and that counsel for defendant was allowed to cross-examine the witness with the testimony she had given in her deposition and at the previous trial.

Donna was examined by counsel for defendant both on cross-examination after her direct testimony and also after testimony had been given by Dr. Wesselhoeft. In general, a survey of the extensive transcript of the examination of Donna reveals that numerous questions were allowed concerning her apprehension of malignancy. Her responses generally were that anyone would be concerned about malignancy, but that she herself had received no specific information on this subject from Dr. Wesselhoeft. She also had received no information from Dr. Wesselhoeft about the possibility of damage to the accessory nerve.

When she first consulted Dr. Wesselhoeft, she expected him to reassure her that no surgical intervention would be necessary. However, in her short interview with Dr. Wesselhoeft, he indicated that he would remove the node, "pop it out," and then have it examined in a biopsy procedure. Many questions were allowed by the trial justice that tended to reveal that Donna did have concern about malignancy, that she received no opinion from Dr. Wesselhoeft about alternatives to surgical excision, and that she did not have even the slightest indication of danger relating to injury to the accessory nerve.

A number of questions posed by counsel for defendant were not allowed because of the assumption of facts not in evidence both before and after the testimony of Dr. Wesselhoeft. It is well-established that the conversation prior to surgery between Donna and Dr. Wesselhoeft was extremely brief, that alternatives to surgery were not discussed, and that the perils of surgery outlined by Dr. Wesselhoeft related only to bleeding and infection. It may be that some of the hypotheticals posed by counsel for defendant were pertinent to the materiality of the failure of defendant to point out the need for surgery and the risks involved therein. However, we are of the opinion that the long cross-examination disclosed to the jury that Donna never had the opportunity to evaluate either the risks involved or the alternatives that might have avoided the risks. Such answers as were given by Donna indicate that with 20–20 hindsight she might well have opted for alternatives, such as observation or needle biopsy, if she had been aware that they were available.

■■■ Our rule in respect to cross-examination is well-settled. The scope and extent of cross-examination are subject to limitations within the sound discretion of the trial justice. Rulings in respect to cross-examination will not be overturned absent clear abuse of discretion. *See, e.g., Avarista v. Aloisio,* 672 A.2d 887 (R.I. 1996); *New England Telephone & Telegraph Co. v. Clark,* 624 A.2d 298 (R.I. 1993); *Watmough v. Watmough,* 430 A.2d 1059 (R.I.1981); *Dixon v. Royal Cab, Inc.,* 121 R.I. 110, 396 A.2d 930 (1979). Moreover, questions on cross-examination that tend to mislead the jury may be excluded by the trial justice in the exercise of his or her discretion. *See State v. Bettencourt,* 723 A.2d 1101, 1110 (R.I.1999). In the case at bar, the trial justice allowed a vigorous and long cross-examination of Donna, and committed no abuse of discre-

tion in excluding a number of persistent and repetitious questions.

After reviewing the transcript of Donna's cross-examination and her testimony as an adverse witness after Dr. Wesselhoeft's testimony, we are of the opinion that if errors were committed by the trial justice in sustaining objections to certain questions, these errors, in the totality of the examination, were not sufficiently prejudicial so as to constitute reversible error. Consequently, we conclude that defendant's contention on this issue must be rejected. We further conclude that ample evidence was presented upon which a jury could well find that Donna did not have the opportunity to evaluate the risks of this procedure and that she was not sufficiently apprised of the risks and alternatives to be charged with having given informed consent. Thus, the trial justice did not commit error in declining to grant defendant's Rule 50 motion for judgment as a matter of law on the issue of informed consent.

## II

### Cross–Examination of Defendant's Witnesses on the Basis of Learned Treatises

During the course of the trial, counsel for plaintiffs used articles contained in various medical publications to cross-examine both Dr. Wesselhoeft and his expert witness, Dr. Peter Altman (Dr. Altman). Two medical treatises, one entitled *Complications of Pediatric Surgery,* and another entitled *Complications in Surgery and Trauma,* were authenticated by plaintiffs' expert, Dr. Brand during the course of his videotaped deposition. This use was proper pursuant to Rule 803(18) of the Rhode Island Rules of Evidence, which reads as follows:

> "*Learned Treatises.* To the extent called to the attention of an expert witness upon cross-examination or relied upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits."

In addition, counsel for plaintiffs used in cross-examination an excerpt from the *Australian NZ Journal of Surgery.* Doctor Altman testified that he was not familiar with this journal, which contained a suggestion that a needle biopsy was a viable alternative to the surgery performed by Dr. Wesselhoeft. Counsel for plaintiffs also used an article from a publication entitled *Archives of Surgery.* Doctor Wesselhoeft acknowledged that he was familiar with this publication and that he had read portions of it on occasion. This article suggested that the use of a nerve stimulator would be helpful in locating and avoiding the spinal accessory nerve. The article suggested that it would be advisable to use such a stimulator in this type of operation.

Further, articles were used in cross-examination from *The Annals of the Royal College of Surgeons of England* and another publication entitled *Surgery, Gynecology and Obstetrics.* These articles contained suggestions that the spinal accessory nerve should be identified and avoided during surgery. While Dr. Wesselhoeft testified that he did not read the former publication, he did admit that he was familiar with both publications. Doctor Altman testified that he was not familiar with *The Annals of the Royal College of Surgeons of England.* He was familiar with the latter publication but not with the articles in question.

■■■ We are of the opinion that, under Rule 803(18), articles, with which a witness is familiar and which have been admitted to be authoritative, properly may be the subject of cross–examination. Indeed, if an expert witness authenticates such an article, it may be read into evidence as

part of the case-in-chief of the proponent and certainly may be utilized in the cross-examination of an adverse witness. However, a learned treatise or an article that is part of a medical journal, but which is not authenticated, should not be used for purposes of cross-examination or for purposes of proof of an issue that is material to the outcome of a case.

■ The reporter's notes on this subject indicate that, while such distinguished writers as Professors McCormick, Morgan, and Wigmore generally have favored the admissibility of learned treatises, the great weight of authority has indicated that a treatise or article must be authenticated as authoritative either by the witness under examination or by another witness who may be the proponent's own expert before it is used on cross-examination. *See Carroll v. Morgan,* 17 F.3d 787, 790 (5th Cir. 1994) (quoting Fed.R.Evid. 803(18), wherein the court held that "[c]ross-examination of expert witnesses with published articles is permitted if the publication is 'established as a reliable authority by the testimony or admission of the witness or *by other expert testimony*' "). In *Carroll,* although the witness under cross-examination refused to recognize the materials as authoritative, another medical expert had testified that the authorities utilized were reliable; nevertheless, the court held that an error excluding such material would not automatically warrant reversal. *See Carroll,* 17 F.3d at 790; *see also Dawsey v. Olin Corp.,* 782 F.2d 1254 (5th Cir.1986) (holding that plaintiffs were not entitled to use statements contained in a manual issued by the former Department of Health, Education, and Welfare to cross-examine an expert witness because no witness had testified that the manual was a reliable authority). Consequently, we are of the opinion that the trial justice erred in permitting the use of certain portions of the *Australian NZ Journal of Surgery* and *The Annals of the Royal College of Surgeons of England,* when no expert witness

had authenticated these materials as reliable.

We must note, however, that both Dr. Wesselhoeft and Dr. Altman strained all credulity when they refused to recognize as authoritative articles in journals with which they were familiar. Their pattern of rejecting all such articles out of hand undoubtedly did not enhance their credibility with the trial justice.

Nevertheless, we are inclined to apply the rule as set forth in the advisory committee's note to Rule 803(18) and require that learned treatises utilized for purposes of cross-examination should be authenticated as reliable by an expert witness. We also recognize that even though a medical journal may have wide recognition, a particular article contained therein may not necessarily be authoritative.

■ The defendant argues that there was no evidence in this case to support the jury's verdict on the negligence count save that suggested by excerpts from treatises used in cross-examination. He argues that Dr. Brand did not in his deposition testimony state that Dr. Wesselhoeft deviated from the standard of practice because the nerve was injured during the course of the procedure. Our reading of Dr. Brand's deposition did include the following excerpt, which managed to elude the persistent objections of counsel for defendant.
"BY MR. ROBINSON:
" * * *

"Q. Assuming, if you will, that Dr. Wesselheoft [*sic* ] made no special attempt to identify the spinal accessory nerve when he performed the cervical node excision, that failure to do so, in your opinion, is that a deviation from the standard of practice when performing a cervical node excision of the posterior cervical triangle?
" * * *

"THE DEPONENT: Well, the answer to that question's yes.
"BY MR. ROBINSON:
"Q. And what is that opinion?

" \* \* \*

"THE DEPONENT: Well, given the question as asked, if a surgeon, any surgeon were to perform a cervical lymph node biopsy without paying attention to the presence of the nerve and thus injured it, if one was—if a surgeon was not paying attention to the presence of the nerve and thus injured it, whether by lack of knowledge of its presence or inattention to the safe conduct of the procedure, that would be a deviation from standard of care."

This testimony by Dr. Brand, together with other evidence relating to the speed with which the operation was performed (approximately six minutes) and the testimony by Dr. Wesselhoeft himself that he did not in the course of the operation see the accessory nerve and that he did not specifically look for it would certainly have supported a jury determination of negligence. Counsel for plaintiffs, in cross-examining Dr. Wesselhoeft from the previous trial transcript, elicited admissions from him that in performing the surgery on Ashley he did not see the spinal accessory nerve, that he did not isolate it, and that he did not look for it.

Thus, we are of the opinion that the use of unauthenticated excerpts from medical treatises and/or articles did not constitute prejudicial error in light of the totality of the evidence presented.

### III

### Statements Made by John Flanagan in his Deposition

■ The defendant argues that the trial justice erred in permitting a certain portion of the deposition of John Flanagan (John), the parent of the minor plaintiff, to be read to the jury. In substance, the trial justice permitted a portion of John's deposition to be read. It stated as follows:

"Question: 'Have you ever asked any doctor for any opinion as to whether Dr. Wesselhoeft did anything wrong?'

" \* \* \*

"Answer: 'Yes, I did.'

"Question: 'Who did you ask?'

"Answer: 'Dr. Norman Cowen.'

"Question: 'Anyone else?'

"Answer: 'And I believe I asked Dr. Rosenwasser also.'

"Question: 'What did they tell you?'

" \* \* \*

"Answer: 'Well, they did not criticize the doctor himself, but they did note that in that type of surgery it's very common practice that the nerves be isolated in a neck surgery. Actually, the standard.'

"Question: 'Both Dr. Cowen and Dr. Rosenwasser told you that it was standard to isolate the nerves?'

" \* \* \*

"Answer: 'Yes.' "

The trial justice allowed this portion to be read on the theory that John's deposition had been read in part by counsel for defendant. The deposition originally was taken on March 14, 1995, on behalf of defendant. After defense counsel had read his portion of John's deposition, plaintiffs' counsel then read the portion quoted above to the jury.

We are of the opinion that the trial justice erred in allowing the reading of this portion of the deposition by plaintiffs' counsel. The statements attributed to the doctors were clearly hearsay and were offered to prove the truth of the matter asserted in clear violation of Rules 801(c) and 802 of the Rhode Island Rules of Evidence. Rule 32 of the Superior Court Rules of Civil Procedure provides that "any part or all of a deposition, *so far as admissible under the Rhode Island Rules of Evidence* [may be read into evidence] as though the witness were then present and testifying." (Emphasis added.) It must be noted that this deposition was taken by defendant for purposes of discovery. Even though counsel for defendant asked these questions for purposes of discovery,

that would not overcome their inadmissibility on hearsay grounds.

 Nevertheless, we conclude that this error is not reversible. There was ample evidence in the case to support the jury's finding of negligence by defendant in failing to isolate and avoid injury to this nerve. Some of it came from Dr. Wesselhoeft himself. Other evidence came from Dr. Brand.

We are of the opinion that the evidence relating to the absence of informed consent, even without any additional evidence relating to negligence, would have been sufficient to support the jury's verdict in favor of plaintiffs. As we have already indicated, that evidence was more than sufficient to overcome a motion for judgment as a matter of law.

## IV

### The Constitutionality of G.L.1956 § 9–21–10(b) Relating to the Computation of Interest

 The plaintiffs in a cross-appeal have challenged the constitutionality of G.L.1956 § 9–21–10(b), which provides that prejudgment interest in medical malpractice actions begins on the date of the written notice of the claim or the filing of the action, whichever occurs first. The parties have stipulated that the operative date as applied to this case would be the date on which the suit was filed. The plaintiffs support their argument by citing *Boucher v. Sayeed*, 459 A.2d 87 (R.I.1983), in which we declared unconstitutional the mandate of a preliminary hearing before a justice of the Superior Court before allowing a medical malpractice case to go forward with a trial by jury. In that case, although we applied the minimal scrutiny of a rational basis test, we held that there was no rational basis to require such a preliminary hearing and that the statute in question violated the principles of equal protection.

However, in the case at bar, the Legislature, in its preamble to § 9–21–10 as amended in 1986 by P.L.1986, ch. 350, § 8, stated that claims were being asserted in increasing numbers against health care providers and that those claims threatened the stability of the Medical Malpractice Joint Underwriting Association of Rhode Island. These findings indicate that there was a rational basis in seeking to protect the viability of a state-sponsored agency created to provide malpractice insurance for physicians and other health care providers. We are of the opinion that the statute rationally furthers a purpose as required by *Boucher*. The findings of the General Assembly relating to the stability of the Medical Malpractice Joint Underwriting Association of Rhode Island are entitled to deference from this Court.

In any event, it is highly questionable whether this issue has been properly preserved for review by this Court since the Attorney General was not served with a copy of plaintiffs' challenge to the statute in the Superior Court. Our statutes and case law clearly provide that no challenge to the constitutionality of a state statute or municipal ordinance may be validly presented unless the Attorney General is "served with a copy of the proceeding." Section 9–30–11; *see also Westerly Residents for Thoughtful Development, Inc. v. Brancato*, 565 A.2d 1262 (R.I.1989); *Brown v. Samiagio*, 521 A.2d 119 (R.I. 1987). Since the Attorney General was not served with a copy of the proceeding and was not given an opportunity to be heard at the trial level, there is no issue before us that may properly be reviewed.

### Conclusion

For the reasons stated, the appeal of the defendant from the judgment entered in the Superior Court is denied and dismissed. The judgment entered in favor of the plaintiffs is hereby affirmed. The cross-appeal of the plaintiffs on the validity of the statute relating to the computation of interest is denied and dismissed. The

papers in the case are remanded to the Superior Court.