Virginia P. FOLEY

v.

ST. JOSEPH HEALTH SERVICES OF RHODE ISLAND et al.

No. 2005–90–Appeal.

Supreme Court of Rhode Island.

June 14, 2006.

Ernest Barone, Esq., North Providence, for Plaintiff.

Ruth DiMeglio, Esq., Providence, for St. Joseph Health Services of R.I.

Michael G. Sarli, Esq., Providence, for St. Joseph Hospital Radiology Assoc., Inc., and A. Hamid Shahinfar, M.D.

Joshua E. Carlin, Esq., Providence, for Bernard Cieniawa, M.D.

Kimberly A. Grabarz, Esq., for John R. Sullivan, M.D.

James Musgrave, Esq., Providence, for Angelo DiCenso, M.D.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Nearly a decade ago, the plaintiff, Virginia P. Foley, suffered a stroke that rendered her unable to live independently. Because she believed that numerous health-care providers gave her negligent care and were responsible for her condition, Ms. Foley brought this medical malpractice action against St. Joseph Health Services of Rhode Island on August 17, 1999. She later amended her complaint to add defendants John R. Sullivan, M.D., Bernard Cieniawa, D.O., St. Joseph Hospital Radiology Associates, Inc., and A. Hamid Shahinfar, M.D. Ms. Foley amended her complaint again to add defendant Angelo DiCenso, M.D.

Eventually, and for a variety of reasons, the claims against all the defendants were dismissed. Doctor DiCenso's motion to dismiss, asserting that the action against him was time-barred by the applicable statute of limitations, was granted first. Then, summary judgment was entered in favor Dr. Shahinfar and St. Joseph Hospital Radiology Associates, Inc. after the hearing justice found that Ms. Foley had failed to present sufficient evidence regarding the standard of care applicable to a radiologist. Finally, a justice of the Superior Court ruled favorably on a motion *in limine* filed by the remaining defendants. That ruling was predicated on her finding that Ms. Foley's expert witness was not qualified to testify about causation, and she therefore entered judgment as a matter of law in favor of St. Joseph Health Services of Rhode Island, Dr. Sullivan, and Dr. Cieniawa. Ms. Foley now appeals each of these decisions to this Court. For the reasons set forth herein, we affirm the judgment of the Superior Court as to each defendant.

### Facts

On October 28, 1997, Ms. Foley was singing in the choir at the Salvatore Mancini Resource and Activity Center in North Providence when she experienced weakness on her right side and fell. She was able to stand with assistance, but the weakness remained. Ms. Foley drove her-

self home, but she fell again when she tried to get out of her car. She struggled up the stairs to her apartment, but fell again once inside. Ms. Foley telephoned Dr. DiCenso, her primary-care physician, who told her to go to the hospital immediately.

An ambulance transported Ms. Foley to Our Lady of Fatima Emergency Room, which is owned and operated by defendant St. Joseph Health Care Services of Rhode Island. Doctor Sullivan examined Ms. Foley in the emergency room. He ordered a variety of tests, including a CT scan [1] of her head, in an effort to determine what was causing the right-sided weakness. When he later responded to interrogatories during the course of the litigation, Dr. Sullivan disclosed that he consulted with Ms. Foley's primary-care physician, Dr. DiCenso, to develop a treatment plan for her. The two physicians concurred that if the CT scan came back negative, then Ms. Foley should be discharged with instructions to take aspirin at home. It appears that Dr. Sullivan made no note of this conversation in the hospital medical records or in his office records.

The CT scan was performed by St. Joseph Radiology, Inc. and was interpreted by Dr. Shahinfar. Although the results of the scan were normal, they were not reported until 5:38 p.m., more than five hours after Ms. Foley arrived at the emergency room.[2] By this time, Dr. Sullivan's shift had ended and he was replaced by Dr. Cieniawa. However, Dr. Sullivan had left a note for his replacement, indicating that Ms. Foley should be discharged with instructions to take aspirin, as long as her CT scan results were normal. Because the results were normal, Dr. Cieniawa discharged Ms. Foley in accordance with Dr. Sullivan's note. He also instructed her to call Dr. DiCenso in the morning.

Ms. Foley went home and went to bed at around 9:45 p.m. after a trying day. She awoke at 5:45 a.m. the next morning feeling "shaky." She got out of bed and walked to the bathroom, where she fell. Unable to get to her feet, she crawled down the hall to the living room. After making an unsuccessful attempt to reach the phone, Ms. Foley remained on the floor and waited until her friend, Ann Marie Kelly, arrived at around 10 a.m. Ms. Kelly immediately called 911 and an ambulance was dispatched to take Ms. Foley once again to Our Lady of Fatima emergency room. This time, Dr. DiCenso treated Ms. Foley when she arrived at the hospital, and he diagnosed her as having suffered a stroke. She remained in the Fatima unit of St. Joseph's Hospital until November 5, 1997, when she was transferred to a rehabilitation unit. Since the stroke, Ms. Foley has not regained her ability to live independently.

## Analysis

### I

### The Motion to Dismiss Dr. DiCenso

When she amended her complaint to add Dr. DiCenso as a defendant, Ms. Foley

---

1. A CT scan (computed tomography), also known as a CAT scan, is

"a procedure in which the brain is X-rayed from many different angles. An X-ray source delivers a series of short pulses of radiation as it and an electronic detector are rotated around the head of the individual being tested. The responses of the detector are fed to a computer that analyzes and integrates the X-ray data from the numerous scans to construct a detailed cross-sectional image of the brain." 2 New Encyclopedia Britannica, 466 (15th ed.1988).

2. The medical records reveal that Ms. Foley arrived at the emergency room at 12:16 p.m. on October 28, 1997. Although it appears that Dr. Shahinfar did not report the results of the CT scan until 5:38 p.m., the medical records state, perhaps mistakenly, that she was released at 5:10 p.m.

alleged that Dr. Sullivan consulted with Dr. DiCenso by telephone on October 28, 1997, and that Dr. DiCenso made the decision to discharge Ms. Foley from the hospital on that day. Promptly, Dr. DiCenso moved to dismiss Ms. Foley's complaint as to him pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, arguing that Ms. Foley's complaint was time-barred because it was brought more than three years after he treated her.[3] A motion justice of the Superior Court agreed with Dr. DiCenso and granted his motion.[4]

■ We observe that in making his determination, the motion justice considered documents, such as Ms. Foley's medical records, which were outside of the pleadings. Therefore, for purposes of this appeal, we will consider the defendant's Rule 12(b)(6) motion as a motion for summary judgment. *See Ouimette v. Moran,* 541 A.2d 855, 856 (R.I.1988) ("If a trial justice, in ruling on a motion to dismiss, considers matters outside the scope of the complaint, the motion is converted into a motion for summary judgment."). Accordingly, we will apply a *de novo* standard of review and affirm the entry of judgment if we are satisfied that no genuine issue of material fact exists and Dr. DiCenso is entitled to judgment as a matter of law. *East Providence School Committee v. Smith,* 896 A.2d 49, 51 (R.I.2006).

■ An action for medical malpractice must be commenced within three years after the occurrence of the incident that gives rise to the action. G.L.1956 § 9–1–

14.1. But, if the injury or damage "could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action, suit shall be commenced within three (3) years of the time that the act or acts of malpractice should, in the exercise of reasonable diligence, have been discovered." Section 9–1–14.1(2). On appeal, Ms. Foley argues that she did not, and could not, have discovered Dr. DiCenso's negligence until April 18, 2003,[5] despite her exercise of reasonable diligence.

In *Dionne v. Baute,* 589 A.2d 833 (R.I. 1991), we addressed a fact pattern that bears similarities to the case before us now. In that case, the plaintiff contended that although she knew of her husband's injury at the time that it occurred, she was not aware of the identity of one of the doctors involved in his treatment until after she filed suit against other defendants. In *Dionne,* medical records indicated that the defendant, who was covering for another doctor, had returned a phone call to the emergency room concerning the treatment of the plaintiff's husband. *Id.* at 834. Although the plaintiff had access to these records as early as 1984, she did not file an amended complaint to add the defendant until July 1988. *Id.* at 834–35. The defendant then moved for summary judgment on the ground that the plaintiff's claim was time-barred by the relevant statute of limitations, and a hearing justice granted the motion. *Id.* at 833. As an issue of first impression, we considered "whether the reasonable-diligence standard of § 9–1–14.1 is applicable to the efforts of a plain-

3. Ms. Foley did not move to amend her complaint to add Dr. DiCenso until February 26, 2004, more than four years after she commenced this action.

4. The motion justice also entered final judgment in favor of Dr. DiCenso based on Rule 54(b) of the Superior Court Rules of Civil Procedure.

5. In her brief, Ms. Foley says that she received Dr. Sullivan's answers to interrogatories, in which he disclosed his consultation with Dr. DiCenso, on April 8, 2003. The record reveals that these answers were filed with the Superior Court on April 18, 2003. We will refer to April 18, 2003, as the date on which Ms. Foley received Dr. Sullivan's answers.

tiff who seeks to determine potential defendants in a malpractice dispute." *Dionne*, 589 A.2d at 835. Concluding that the reasonable diligence standard did apply, we said that when asserting a malpractice claim "it is necessary for a plaintiff to investigate diligently who may or may not have had any exposure to liability during treatment." *Id.* We also held that whether a party has exercised reasonable diligence is a question of law. *See id.* Based on the facts present in *Dionne*, we determined that the plaintiff did not exercise reasonable diligence because she failed to bring suit against the defendant until July 1988, even though she received the medical records in 1984. *Id.* We held that once she obtained her husband's medical records she was obligated to diligently examine them. *Id.*

Ms. Foley attempts to distinguish her case from *Dionne*, maintaining that here, unlike in that case, there was nothing in the medical records or Dr. DiCenso's office records that would have suggested that Dr. DiCenso consulted with Dr. Sullivan when Ms. Foley was in the emergency room the day before her stroke. She also argues that although she eventually discovered from Dr. Sullivan's responses to interrogatories that Dr. Sullivan consulted with Dr. DiCenso, she did not receive those responses until April 18, 2003, because Dr. Sullivan suffered a stroke after the interrogatories were propounded, thus delaying his answers. Therefore, she contends, the three-year statute of limitations should not have begun to run until she received the responses to the interrogatories that she propounded to Dr. Sullivan. It was only then, she argues, that she

discovered that Dr. DiCenso was involved in the decision to discharge her the day before she was stricken.

After a thorough review of the record, we conclude that Ms. Foley had ample opportunity from the time of her injury to discover Dr. DiCenso's involvement in her treatment and his potential liability, but she did not exercise reasonable diligence. After all, Dr. DiCenso was Ms. Foley's primary-care physician, and it was he whom she called on October 28, 1997, after she had fallen multiple times. Doctor DiCenso referred her to the emergency room on October 28, 1997, and also treated her when she returned to the emergency room the next day. Ms. Foley was well aware that Dr. DiCenso had treated her before and after her stroke, and yet she never availed herself of an opportunity to depose him and question him about the circumstances surrounding her discharge from the emergency room on October 28, 1997. Because she did not exercise reasonable diligence, § 9–1–14.1(2) does not apply, and we affirm the motion justice's decision to dismiss Dr. DiCenso from this case.[6]

## II

### Summary Judgment: The Radiologists

To support their motion for summary judgment in the Superior Court, Dr. Shahinfar and St. Joseph Radiology Associates, Inc. argued that Ms. Foley failed to present expert evidence to establish an applicable standard of care for radiologists. A motion justice of the Superior Court agreed with the defendants, and summary judgment was entered in their favor on May 21, 2004.[7] On appeal, Ms. Foley con-

6. In her brief, Ms. Foley concedes that she waited until August 15, 2001 (almost four years from the time of her stroke, and eleven months after she moved to add Dr. Sullivan as a party defendant) to propound interrogatories to Dr. Sullivan, who treated her at the emergency room.

7. Due to confusion over whether the claims against Dr. Shahinfar were identical to those against St. Joseph Radiology Associates, Inc., the motion justice initially denied St. Joseph Radiology Associates, Inc.'s motion for summary judgment without prejudice, but later

tends that it was not necessary for her to provide an expert opinion because the negligence of Dr. Shahinfar and St. Joseph Radiology Associates, Inc. was patently obvious.

It is well-settled law in this jurisdiction that "[i]n any negligence action, such as a medical malpractice case, it is the plaintiff's burden to establish that the defendant had a duty to act or refrain from acting and that there was a causal relation between the act or omission of the defendant and the injury to the plaintiff." *Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 514, 382 A.2d 514, 516–17 (1977). Time and time again we have required "expert testimony * * * to establish deviation from the standard of care when the lack of care is not so evident as to be obvious to a lay person." *Boccasile v. Cajun Music Limited*, 694 A.2d 686, 690 (R.I.1997) (quoting *Richardson v. Fuchs*, 523 A.2d 445, 450 (R.I.1987)).

Here, plaintiff's expert, Dr. Andrew Nathanson, unequivocally testified during his deposition that he did not plan to testify at trial about the standard of care that applies to a radiologist such as Dr. Shahinfar. He further commented that "I think the standard of care was met by the radiologists, even though I'm not a radiologist. I have no problems with—I think radiology should be thrown out of the case." Ms. Foley provided no other expert testimony regarding the appropriate standard of care for radiologists. Her argument on appeal is that the delay of more than five hours from the time she was admitted to the emergency room until the radiology department reported the results of her CT scan qualifies as patent negligence.[8] Therefore, she argues, it was not necessary for her to present an affida-

vit or other evidence from an expert to establish a standard of care and breach of that standard. We disagree.

In *Boccasile*, 694 A.2d at 689, the plaintiff alleged that a defendant doctor was negligent because she caused a delay in the treatment of the plaintiff's husband. The plaintiff contended that the defendant physician failed to bring any medical equipment with her when she first attended to the plaintiff's husband and therefore negligently delayed the administration of a drug to him that, in part, resulted in his death. *Id.* The defendant doctor was granted summary judgment, and the plaintiff appealed. *Id.* When we reviewed the case on appeal, we faulted the plaintiff for failing to present "any standard-of-care evidence, any medical affidavits establishing alleged deviations from those standards, or any expert attributions of causation * * *[,]" and affirmed the Superior Court's entry of summary judgment against the plaintiff. *Id.* at 690.

Here, as in *Boccasile*, we do not believe that the delay was so patently negligent that it alleviated the plaintiff's burden to present expert testimony with respect to a standard of care for radiologists and deviation from that standard by Dr. Shahinfar or St. Joseph Radiology Associates, Inc. Indeed, it is difficult for this Court to comprehend how the alleged negligence in this case could be so evident that it would be obvious to a lay person, when plaintiff's own expert, an emergency room physician, testified that the radiologists met the standard of care. Based on our well-established caselaw in this area and the deposition testimony of plaintiff's expert witness, we hold that the alleged lack of care on the part of Dr. Shahinfar and St. Joseph Ra-

granted the motion after a subsequent hearing.

8. Ms. Foley concedes that she waited only three hours from the time that she was sent to the radiology department until the results of the CT scan were reported.

diology Associates, Inc. was not so evident that it would be obvious to lay people. As a result, when she opposed the motion for summary judgment, Ms. Foley had the burden of presenting evidence from an expert regarding the applicable standard of care, deviation from that standard of care, and causation between the act or omission and the injury to plaintiff.

In an apparent effort to do just that, counsel for plaintiff also sought to introduce a variety of medical texts to establish a standard of care. However, the motion justice determined that the presentation of medical texts, without more, could not assist plaintiff in establishing a standard of care and deviation from that standard. We agree.

■ General Laws 1956 § 9–19–30 provides that a party to a civil malpractice action may introduce published works on a subject of science "insofar as the court shall find that the statements are relevant and that the writer of the statements is recognized in his or her profession or calling as an expert on the subject." We have interpreted this statute and said that "[a]lthough under § 9–19–30 statements in a treatise are admissible in a medical-malpractice action as evidence tending to prove the facts or opinions they contain, they cannot be relied upon in the absence of other evidence to establish deviation from the standard of care." *Richardson*, 523 A.2d at 450.

First of all, Ms. Foley did not satisfy § 9–19–30 because she presented no evidence that the authors who wrote the texts upon which she intended to rely were recognized as experts in their fields. In addi-

tion, the textbooks were not authenticated. We have said that "a learned treatise or an article that is part of a medical journal, but which is not authenticated, should not be used for purposes of cross-examination or for purposes of proof of an issue that is material to the outcome of a case." *Flanagan v. Wesselhoeft*, 765 A.2d 1203, 1209 (R.I.2001). Under Rule 803(18) [9] of the Rhode Island Rules of Evidence some foundation must be laid before the contents of a published treatise, periodical, or other pamphlet may be admissible. In *Flanagan*, we explained that "the great weight of· authority has indicated that a treatise or article must be authenticated as authoritative either by the witness under examination or by another witness who may be the proponent's own expert before it is used on cross-examination." *Flanagan*, 765 A.2d at 1209.

■ Here, plaintiff's counsel did not offer a scintilla of evidence that the authors of the textbooks that he intended to cite were experts in their fields, nor was there even a scrap of evidence that the texts themselves were reliable. Therefore, we conclude that the motion justice did not err in finding that Ms. Foley could not rely on textbooks to establish a standard of care for Dr. Shahinfar or St. Joseph Radiology Associates, Inc. The alleged negligence was not so evident as to be obvious to a lay person, yet Ms. Foley failed to present any evidence whatsoever to establish a standard of care and breach of that standard by Dr. Shahinfar and St. Joseph Radiology Associates, Inc. After conducting a *de novo* review of the motion justice's decision to grant summary judgment, we

9. Rule 803(18) of the Rhode Island Rules of Evidence provides:

"To the extent called to the attention of an expert witness upon cross-examination or relied upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits."

are satisfied that plaintiff has raised no genuine issue of material fact in her case against the radiologists. *See East Providence School Committee*, 896 A.2d at 51. Therefore, we affirm the decision of the motion justice to grant the defendants' motion for summary judgment.

## III

### Motion *in Limine:* The Remaining Defendants

The remaining defendants, Dr. Cieniawa, Dr. Sullivan, and St. Joseph Health Services of Rhode Island, appeared before a justice of the Superior Court on a motion *in limine* to preclude plaintiff's expert, Dr. Nathanson, from testifying about causation. After taking testimony and hearing the arguments of the parties, the court granted the defendants' motion *in limine* and then, after determining that plaintiff had no further evidence to submit on the issue of causation, entered judgment as a matter of law in favor of defendants pursuant to Rule 50 of the Superior Court Rules of Civil Procedure.[10]

▮ The justice's finding that Dr. Nathanson was not competent to testify about causation was based on the witness's concession during his deposition that he would defer on that issue to the opinion of a neurologist. During that deposition on

May 26, 2004, the following colloquy took place:

"Q. [Y]ou do not consider yourself either competent or qualified to give any opinions on causation, is that true?

"[Counsel]: Objection.

"[Dr. Nathanson]: On causation?

"Q. In terms of whether any treatment would have made any difference in this case?

"A. I'm going to let a neurologist speak to that.

"Q. So your answer is you're not—you don't consider yourself to be competent and qualified[.]

"Q. I know what the standard of care would have been at my hospital for somebody who had a stroke, that I can testify to."

On November 29, 2004, at the hearing on the motion *in limine*, Dr. Nathanson acknowledged his deposition testimony, in which he declined to testify as to causation and said he would defer to the opinion of a neurologist.[11] He told the court, however, that since the deposition he had done some reading to prepare for this case as well as for his board examinations, and he testified that the administration of aspirin to Ms. Foley before her stroke, or TPA[12] after it, could have altered the medical result in her case.

10. It appears that at the conclusion of the hearing on the motion *in limine,* counsel for plaintiff agreed that the entry of judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure would be appropriate.

11. In addition, Ms. Foley disclosed in answers to interrogatories that she intended to call Dr. Nathanson to testify about the standard of care applicable to health-care providers when a patient arrives at an emergency room with symptoms typical of a stroke. She did not indicate, however, that Dr. Nathanson was going to give an opinion about the relationship between these deviations from the stan-

dard of care and the injury that Ms. Foley suffered. The transcript from the hearing on this motion reveals that although counsel for plaintiff claimed that he updated these answers pursuant to Rule 33(c) of the Superior Court Rules of Civil Procedure, there was no indication in the docket that he filed amended answers, and all of the defendants present at the hearing denied ever receiving them.

12. Doctor Nathanson testified that TPA, or tissue plasminogen activator, is "something that occurs naturally in the body and it breaks up clots that have already formed. It's now available as a drug, and it's given to heighten or dissolve clots that have already formed."

The justice was clearly troubled by Dr. Nathanson's recently acquired expertise in the area of causation. She noted that based on Dr. Nathanson's own deposition testimony, the appropriate person to testify about causation in a case such as this would be an expert in neurology. The justice explained: "[I]t does not matter that he [Dr. Nathanson] does not practice in neurology so long as he has sufficient knowledge, skill, experience, training and education in the field of neurology to offer a competent opinion as to causation." However, she continued, Dr. Nathanson "did nothing other than read some literature in the area in question and then comes in here and says I wasn't competent in May, but I'm competent today; that's troubling to me. That's troubling."

After considering the testimony that she had heard during the motion *in limine* and the arguments of counsel, the trial justice ruled that she was not satisfied that the witness was now qualified to testify about causation. She also found his testimony about the administration of aspirin and the benefits of TPA to be speculative. For those reasons, the hearing justice granted the defendants' motion *in limine* and excluded any testimony from Dr. Nathanson about causation. On appeal, Ms. Foley argues that the motion justice abused her discretion when she found that Dr. Nathanson was not qualified to testify about causation. She also urges us to revisit our decision in *Contois v. Town of West Warwick*, 865 A.2d 1019, 1023 (R.I.2004), and adopt the so-called "loss of chance" doctrine.

 It is well settled that "[t]he determination of whether to qualify and permit an expert witness to proffer an expert opinion relative to an issue in dispute is left to the discretion of the trial justice and this Court will not disturb that determination absent clear error or an abuse of discretion." *Debar v. Women*

*and Infants Hospital,* 762 A.2d 1182, 1185 (R.I.2000). We are also mindful that such deference does not ·mean that the trial justice's ruling is not reviewable. *Id.* Rather, we must be satisfied that the trial justice's discretion was "soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action, * * * and not arbitrarily or willfully, but with just regard to what is right and equitable under the circumstance and the law." *Id.* at 1185–86 (quoting *DeBartolo v. DiBattista,* 117 R.I. 349, 353, 367 A.2d 701, 703 (1976)).

 The General Assembly has identified the qualifications that a witness must possess to offer an expert opinion. Section 9–19–41 provides in pertinent part:
"In any legal action * * * for personal injury or wrongful death filed against a licensed physician, [or] hospital * * * based on professional negligence, only those persons who by knowledge, skill, experience, training, or education qualify as experts in the field of the alleged malpractice shall be permitted to give expert testimony as to the alleged malpractice."

When interpreting this statute we have found nothing in its plain and unambiguous terms that requires an expert in a medical malpractice case to practice in the same specialty as the defendant or have training in the same medical specialty as the defendant. *Debar,* 762 A.2d at 1186. We have explained that an expert's opinion may be heard to aid the jury in its quest for truth "where the subject matter of the testimony is of a mechanical, scientific, professional or like nature, none of which is within the understanding of laymen of ordinary intelligence, and where the witness seeking to testify possesses special knowledge, skill or information about the subject matter acquired by study, observation, practice or

experience * * *." *Morgan v. Washington Trust Co.*, 105 R.I. 13, 17–18, 249 A.2d 48, 51 (1969).

Here, Dr. Nathanson admitted in May 2004 that on the issue of causation, he would defer to the opinion of a neurologist. Six months later, however, plaintiff's counsel claimed that Dr. Nathanson had become qualified to offer expert testimony on causation. Given these circumstances, it is our opinion that under § 9–19–41, as well as our established case law in this area, the trial justice did not abuse her discretion, but exercised it soundly and judicially when she ruled that Dr. Nathanson was not qualified to testify as an expert on the issue of causation.

Nevertheless, the plaintiff maintains that we should revisit our decision in *Contois* and adopt a "loss of chance" approach to causation.[13] It is clear to this Court, however, that even under a loss of chance approach to causation, a plaintiff has the obligation to present evidence that the alleged negligence was a proximate cause of the loss of chance. *See Contois*, 865 A.2d at 1023. Because the plaintiff's expert in this case was not competent to offer expert testimony on causation, and there was no other evidence tending to prove causation, we decline to accept the plaintiff's invitation to adopt any version of the loss of chance doctrine, since it would not alter our decision to deny the plaintiff's appeal.[14] We are convinced, after a thorough review of the record in this case, that the motion justice did not abuse her discretion when she granted the motion *in limine* and we uphold the entry of judgment as a matter of law in this case.

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court, to which we remand the papers in this case.

---

**13.** In *Contois v. Town of West Warwick*, 865 A.2d 1019, 1023 (R.I.2004), we discussed a growing trend among jurisdictions around the country to adopt loss of chance, which is a doctrine that allows a plaintiff to recover on the basis that the defendant's negligent conduct caused the plaintiff to lose a chance to avoid the harm ultimately suffered.

**14.** The record provided to us reveals that it was the trial justice who urged plaintiff to preserve loss of chance so that it could be raised on appeal. We also note that our decision in *Contois* had not yet been delivered at the time of the hearing on the motion *in limine*.