DECISION
This matter came on for a jury-waived trial before the Court. After reviewing all of the evidence and carefully considering the statements and briefs tendered by counsel, the Court issues this Decision.
 Findings of Fact
The defendants John Quattrocchi, III and James R. Quattrocchi were the owners of waterfront property at 325 Water Street, Warren, Rhode Island during the year 2000. The Warren River Boatworks ("WRB") was a tenant on this property, using some of the water space and buildings to commercially store and service boats. Paul Dennis was the owner and operator of WRB. WRB operated from this location since 1992. The water space used by WRB was changed from year-to-year by an independent agreement between the defendants and WRB.
For the 2000 boating season, WRB used a 60-foot dock space along Dock B, and a 40-foot dock space along Dock D. This dock space was rented by WRB, though a written lease was never fully executed. (See Exhibits 3 and 4.)
The docks were in a continual state of disrepair. Although Mr. Dennis notified the Quattrocchis of the need for maintenance, defendants performed repairs sporadically at best. *Page 2 
Because WRB stored customers' boats at the site and was concerned for safety and appearance, it would voluntarily repair some docks from time-to-time. This included replacing some planks. On occasion, WRB would bill (or request a credit) for work done or supplies used for dock repair. (See, e.g., Exhibit 1, Ltr. of October 31, 2001.)
WRB never agreed to maintain the docks for the defendants, nor did it agree to insure or indemnify the Quattrocchis for any losses.
In the spring of 2000, Dock B was in obvious disrepair. The structural integrity of other docks had also become questionable. In February, Mr. Dennis tendered a draft lease to the Quattrocchis. In it, Mr. Dennis proposed that WRB maintain the docks which were in need of refurbishment. The Quattrocchis refused this proposal.
John Quattrocchi, III would periodically walk the docks when he was in the area, but not as a regular, formal inspection. He viewed the docks at least once in May of 2000. The Quattrocchis were aware that the docks required regular, on-going maintenance from year-to-year. Although John Quattrocchi, III occasionally visited the docks, he testified that Mr. Dennis was responsible for maintenance. This obligation is not in any written or oral agreement.
WRB hired the plaintiff, Stanley Matthews, as a laborer in 1997. Mr. Matthews was born in 1955. He worked repairing, customizing and improving customers' boats. He performed inspections, electrical work, and some mechanical work. His pay varied sometimes earning overtime, sometimes working minimal hours. The Court finds his regular wages were $640 per week.
On May 26, 2000, Mr. Matthews and Mr. Dennis were working for WRB by launching a boat nearby and moving it into a space on Dock B of the Quattrocchis' docks. As the boat neared Dock B, Mr. Matthews jumped down approximately 2 feet to tie the boat to a dock. As *Page 3 
he did so, his left foot and lower leg crashed through a rotten plank on the dock. His left knee was significantly injured in the fall.
Prior to the injury, the board on which Mr. Matthews landed had rotted, but the damage was not readily visible from above.[1] In disembarking from the boat onto the dock, Mr. Matthews did nothing unusual before falling through the plank.
Mr. Matthews was in obvious pain from the fall. He promptly extricated himself and went home. For the next several days, he placed ice on his knee and took ibuprofen. He attempted to report to WRB for work but could not fulfill his regular schedule due to the pain.
On June 14, 2000, Mr. Matthews was treated at the Newport Hospital emergency room for continued problems and pain with his left knee. He remained under the treatment of Dr. Gary Ferguson for the rest of the year. For the continuing sprain, Dr. Ferguson supervised Mr. Matthews' physical therapy and did not release him to work until August 18, 2000. Mr. Matthews' condition worsened by September 1, 2000 which prevented him from working until November 8, 2003. Thereafter, the medical notes establish more random treatment with periodic flare-ups of the knee — with mild persistent pain and swelling.
As the problem remained unresolved, Mr. Matthews was repeatedly encouraged to see an orthopedic specialist. He did not do so until his April 14, 2003 meeting with Dr. Michael J. Infantolino. Dr. Infantolino ordered him not to work and scheduled an exploratory arthroscopy. With repeated complaints and visits by Mr. Matthews, Dr. Infantolino continued to recommend surgery and repeatedly attempted to schedule it. Because of a variety of excuses from Mr. Matthews, the surgery was not completed as of June 18, 2005 according to Dr. Infantolino. There is no indication that the exploratory arthroscopy was ever completed. *Page 4 
Dr. Elie Cohen is an orthopedic surgeon who was retained by the defendants for an independent medical examination. Dr. Cohen diagnosed Mr. Matthews with unresolved traumatic knee synovitis and found Mr. Matthews permanently partially disabled from most physical work. According to Dr. Cohen, Mr. Matthews can work at a job which does not require heavy labor, but he may do sedentary work. Mr. Matthews is and has been reluctant to attempt to do any work over the past few years. His pain continues but is mild and flares only when stressed.
Prior to Mr. Matthews' fall, the defendants had no regular system or procedure for dock inspection. Although John Quattrocchi, III testified that he inspected the docks by walking them periodically, the Court finds that he would walk the docks only occasionally when in the area. This was not an "inspection," but a casual walkabout. In the spring of 2001, he visited the docks once every month (at most) and performed no maintenance. The docks were in need of repair at this time. The defendants had been told about the poor condition of the docks after the winter and did nothing to improve the situation before Mr. Matthews fell.
The practice of most large marinas is to walk the docks periodically to check for loose boards and poor hardware. In late spring and summer, this is routinely done at least one time per week. Persons in charge of maintenance then promptly repair loose and weak planks. The plank involved in the case at bar was significantly rotten from the bottom up. While a casual walkabout may not have revealed the rotten board, a regular, thorough inspection would have revealed the rot. The Court reasonably infers that the use of the dock necessarily involves *Page 5 
persons disembarking on and off the docks, sometimes stepping on one or two ledger boards with full weight.[2]
The Court finds Mr. Matthews fully impaired and in significant pain and suffering through June 16, 2000. His pain and suffering moderated thereafter, as discussed below. The parties stipulated that Mr. Matthews' medical bills totaled $6628.52.
 Analysis and Conclusions of Law
1. Credibility of the Witnesses
Our high court has encouraged trial courts to articulate its assessments of witnesses' credibility. State v. Forbes, 925 A.929 (R.I. 2007).
This Court found the testimony of Mr. Paul Dennis, the owner of WRB, to be highly credible. He was particularly descriptive of the events of the loss and very careful to weigh each question and reflect before answering. His testimony was not in conflict with any other testimony nor did the Court have any reason to doubt his word.
Dr. Cohen's credibility was also high. Retained originally by the defendants, he testified on behalf of Mr. Matthews at trial. He was firm in his testimony (even when cross-examined by defendants) that Mr. Matthews was significantly injured. He was cautious in his testimony, qualifying it appropriately by explaining the basis of his reasoned conclusions.
John Quattrocchi, III was intelligent but qualified many of his answers. As a defendant, his answers were both guarded and self-serving. At times he did not directly answer questions, insisting on describing his own version of events. Therefore, the Court found him far less credible. *Page 6 
Mr. Keyworth was the manager of Brewers Marina. The Court found him to be extremely credible, frank and cooperative. He testified on behalf of the plaintiff as to the standards of maintenance by other marinas. Clearly, the trial and his testimony were extremely important to him and he displayed at all times that he was attempting to answer truthfully. There was no reason to doubt Mr. Keyworth's testimony.
Plaintiff Stanley Matthews' answers to all of his questions were not as direct and at times were self-serving. He insisted on attempting to control the proceedings to assure that his version was told. He justified all actions which he took, never explaining how he lost several jobs and why he was not fully employed. He accepted no fault for any of his misfortunes. He was not always frank but had considerable self-esteem. For example when he was asked whether he could do light duty, on cross-examination he indicated "I don't know, maybe." His description had considerable gaps. For example, there was never a clear explanation of why he cancelled surgery and his stated reason changed significantly from direct examination to cross-examination.
Mr. Collyer is a marina surveyor and was a manager of the New Bedford Yacht Club. The Court found him to be rational and extremely credible but for his testimony that a person disembarking from a boat must look for screw heads and support boards before stepping onto a dock.
2. Contract beneficiary
The complaint sounds in two counts. Count I alleges that the plaintiff is a third-party beneficiary of a contract entered into between the defendants and WRB. Count II sounds in negligence. *Page 7 
An intended third-party beneficiary may sue on a contract made for his or her benefit. Curato v. Brain, 715 A.2d 631 (R.I. 1998); Davis v. NewEngland Pest Control Co., 576 A.2d 1240, 1242 (R.I. 1990). This right of enforcement, however, is contingent upon the third-party's assenting to or ratifying the contract. Curato at 635. Here, an established contract between WRB and the defendants was not established. Any previous lease expired, a new lease was being negotiated, and the tenant occupied the property at will. Even if some contract did exist, no existing contract was designed to protect Mr. Matthews.
3. Negligence
"To prevail on a claim of negligence, a plaintiff must establish a legally cognizable duty owed by defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss are damage." Selwyn v. Ward, 879 A.2d 882,886 (2005). In order to establish a breach of a duty of care, if that duty is not obvious or discernable without the existence of an expert opinion an expert is needed to establish the standard of care.Mactavish v. Rhode Island Hospital, 795 A.2d 1119 (R.I. 2002). The simple construction of a dock, and the failure to repair that dock yields duties easily discernable to a layperson. Nevertheless each of the parties put forth an expert to establish the standard of care. While that testimony assisted the Court in dock construction, management and inspections, the defective and unsafe condition of this dock was evident.[3] Sufficient evidence existed establishing that if the Quattrocchis exercised reasonable care, they would have known of the dangerous condition. In addition, there was no written lease in effect[4] for the docks, and therefore, the Quattrocchis *Page 8 
were solely responsible for the maintenance and repair. Lucier v. ImpactRecreation, Ltd., 864 A.2d 635, 639 (R.I. 2005).
Failure to perform regular inspections or repairs, to the detriment of Mr. Matthews, constituted a breach of the Quattrocchis' duties. It was undisputed that Mr. Matthews fell through a rotted board. Hence, Mr. Matthews established that his resultant injuries were causally connected to the Quattrocchis' breach. Foley v. St. Joseph Health Services ofRhode Island, 899 A.2d 1271, 1277 (R.I. 2006).
While Mr. Matthews was injured, his period of pain and suffering was limited as he has failed to receive the recommended treatment and surgery. His treating physicians, including Dr. Infantolino, recommended that he undergo an arthroscopic examination in May 2003. Mr. Matthews never offered a cogent explanation for his failure to obtain this surgical treatment over four years.[5] No risk was discussed at trial, nor did Mr. Matthews establish that he was fearful. He therefore failed to mitigate his damages after the tortuious conduct. Proximate cause is established by showing that the plaintiff's harm would not have occurred but for the defendant's negligence. Schenck v. Roger Williams GeneralHospital, 119 R.I. 510, 514, 382 A.2d 514, 517 (1977) (citation omitted). Moreover, such "causal connection between negligence and a plaintiff's injury must be established by competent evidence and may not be based on conjecture or speculation." McLaughlin v. Moura,754 A.2d 95, 98 (R.I. 2000) (citing Skaling v. Aetna Insurance Co., 742 A.2d 282,288 (R.I. 1999)). Mr. Matthews' unexplained delay, if not refusal, to receive surgery, should not provide the basis for his claim of permanent injury. As a reasonable person would have avoided much of this pain, suffering and disability, such damages cannot be said to have proximately resulted from the Quattrocchis' conduct. When physicians *Page 9 
recommended further treatment and Mr. Matthews disregarded their advice, the causal connection between Mr. Matthews' injury and the harm became overly speculative. Furthermore, a plaintiff claiming injury that is due to tort "has a duty to exercise reasonable diligence and ordinary care in attempting to minimize damages." Tomaino v. Concord Oil of Newport,Inc., 709 A.2d 1016, 1026 (R.I. 1998). Mr. Matthews did not do so.[6]
In the same, Mr. Matthews equivocal response as to whether he could perform light duty underscores the Court's inability to find continuing damages.
Had Mr. Matthews had the surgery in April 2003 and recovered several weeks thereafter, his injury may have been resolved. Mr. Matthews failed to meet his burden to establish that his pain and suffering was not speculative after June 1, 2003.[7]
Having reviewed the medical records and listened to all testimony, the Court finds Mr. Matthews to have significant pain and suffering for the 3 weeks following his fall and places a value of $1500 for each week. For the next 26 weeks, the Court finds Mr. Matthews experienced moderate pain and suffering which the Court values at $250 per week. For the following 128 weeks, through June 1, 2003, the Court assigns a value of $100 to Mr. Matthews' pain and suffering. The court finds no ongoing pain and suffering after June 1, 2003, proximate to this fall. The total pain and suffering is therefore $23,800. *Page 10 
4. Comparative Negligence
Although the Quattrocchis are primarily to blame for this breach, Mr. Matthews is not without fault. Mr. Matthews testified that he was familiar with the dock prior to its fall. He stated that he walked the docks often, and was highly critical of the maintenance of the docks. He testified that Dock B was always in a state of disrepair, he constantly complained about it, and even marked boards that should be repaired. Knowing that the docks were in some state of disrepair, he is partially responsible for his own injuries. Mr. Matthews breached his duty to use ordinary care for his own safety, failing to exercise that degree of care for his own safety that a reasonably prudent person would exercise under the same circumstances. See R.I.G.L. § 9-20-4. Mr. Matthews' own negligence was also a proximate cause of the fall. As the total negligence involved in the fall totals 100%, after considering all of the evidence submitted, the Court apportions 80% of the negligence to the defendants.[8]
5. Damages
The parties stipulated that Mr. Matthews medical bills totaled $6628.52. Mr. Matthews' pay from Warren River Boatworks was a gross of $640.00 per week. His lost wages, resulting from this fall, were $8320 in wages during the year 2000. He worked during all of 2001. The Court finds he lost no wages after January 1, 2002. As stated above, the total pain and suffering awarded is $23,800.[9] The total damages therefore total $38,748.52.
As discussed in the comparative negligence subsection above, the Quattrocchis were 80% responsible for Mr. Matthews' injury. The total damages for their negligence is therefore $30,998.82. *Page 11 
 Conclusion
For the reasons stated, judgment shall enter for the defendants John Quattrocchi, III and James R. Quattrocchi on Count I of the Complaint. Judgment shall enter for plaintiff Stanley Matthews against the defendants on Count II of the Complaint and total damages awarded to Mr. Matthews shall be $30,998.82 plus prejudgment interest, post-judgment interest and costs. Counsel for Mr. Matthews shall prepare an appropriate judgment consistent with this Decision.
[1] The broken board was replaced and discarded by WRB within days of the injury. The defendants were not informed of the event until some time thereafter.
[2] Mr. Collyer testified that before disembarking a boat, one should look for the screw heads and be sure to land on a board which is supported by a cross joist. The Court did not accept this testimony as reasonable or credible. Rather, a dock owner should expect persons to disembark by placing their full weight on any of the surface of the dock.
[3] While the fact finder did not require expert opinion to demonstrate the duty of care, the testimony of Mr. Keyworth was convincing. He logically and credibly explained the process in which marinas are inspected and docks repaired. Defendants' expert, Mr. Collyer, described a similar inspection process, but his description of the need for invitees to examine screw heads and support beams before walking on docks was nonsensical.
[4] Note that the proposed leases discuss the leasing of water space. While this obviously results in the dock being used, the dock is only a means of egress and it is the water area which is actually leased.
[5] Mr. Matthews' explanations for not having surgery are contradictory to his claim of pain and suffering. He stated he did not want to miss time out of work, and couldn't afford surgery. He admitted he did some work on boats during this period, including serving as a crew member on a Marion to Bermuda Race.
[6] Mr. Matthews' medical records corroborate his failure to conform to medical recommendations. For example, in September 2000, he refuses to accept a physical therapy routine. Dr. Ferguson's notes of September 1, 2000, October 23, 2000, February 26, 2001 and February 5, 2003 verify that he wishes to proceed on his own.
[7] "The common law required the plaintiff to prove, with certainty, both the existence of damages and the causal connection between the wrong and the injury. No damages could be recovered for uncertain, conjectural, or speculative losses." Associated General Contractors ofCalifornia, Inc. v. California State Council of Carpenters,459 U.S. 519; 103 S. Ct. 897; 74 L. Ed. 2d 723 (1983). Footnote 26, citations omitted. For a discussion on the obligation to mitigate damages in a personal injury action, See William T. Paulk, Mitigation ThroughEmployment in Personal Injury Cases: The Application of the "Reasonable"Standard and the Wealth Effects of Remedies, 58 Ala. L. Rev. 647, (2007).
[8] The Court was never asked to apportion the liability of Mr. Matthews employer, a third party to the litigation. However, the Court finds that 20% of the negligence is apportioned to Mr. Matthews or persons who are not parties to this litigation.
[9] Lost wages, medical bills and pain and suffering were the only damages requested. *Page 1