**Jean M. BOCCASILE et al.**

v.

**CAJUN MUSIC LIMITED et al.**

**Nos. 96–6–Appeal, 95–418–Appeal.**

Supreme Court of Rhode Island.

May 9, 1997.

Edward Gnys, Jr., Christopher Rawson, Providence, for Plaintiff.

David P. Whitman, Elizabeth Flynn Sullivan, Donald Migliori, Providence, Joseph Salvadore, North Providence, Mark Dolan, Providence, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, and FLANDERS, JJ.

## OPINION

FLANDERS, Justice.

The deceased, Ralph Boccasile (Boccasile), was attending the 1989 Cajun Music Festival (the festival) in Escoheag, Rhode Island, when he experienced a severe allergic reaction to the seafood in some of the gumbo he had been sampling. The festival's first-aid crew succored Boccasile, but unfortunately they were unable to prevent him from eventually succumbing to anaphylactic shock.

In this consolidated appeal, his widow, Jean M. Boccasile (plaintiff),[1] asks us to reverse the Superior Court's entry of summary judgment in favor of two of the festival's emergency health-care providers, defendants Aline A. Daguanno Champoux, R.N. (Nurse Champoux), and Sarah John, M.D. (Dr. John). The plaintiff sued these and other defendants for negligence in connection with the alleged wrongful death of her husband.

Doctor John and Nurse Champoux argue that because they had volunteered to staff a first-aid station at the festival, one or more of Rhode Island's good-Samaritan statutes[2] protect them from liability for all but gross, willful, or wanton negligence. They also contend that the judgments below should be affirmed because plaintiff failed to produce any evidence of negligence in opposing their summary-judgment motions. The plaintiff, on the other hand, claims the good-Samaritan statutes are inapplicable to these defendants because, as health-care providers engaged to provide emergency-health-care services to the festival-attending public, they had a pre-existing duty to render emergency medical care to her stricken husband, a duty that she claims they badly botched when they supposedly bungled various attempts to treat his allergic reaction.

Our de novo review[3] of the record reveals that in opposing summary judgment, plaintiff failed to submit any expert affidavits or other evidence that, if believed, would establish negligence on the part of either defendant. For this reason, even assuming (without deciding) that defendants are unable to take advantage of the good-Samaritan statutes because their emergency assistance was not rendered gratuitously, we nonetheless conclude that each defendant was entitled to summary judgment as a matter of law and that therefore the Superior Court properly entered judgments in favor of these defendants. As indicated by the undisputed facts recited below, plaintiff had to come forward with expert medical evidence to survive defendants' summary-judgment motions, but she failed to do so.

## Facts

In the late summer of 1989, while attending the festival at the Stepping Stone Ranch in Escoheag, Rhode Island, Boccasile apparently ate some Cajun gumbo that contained fish (to which he was allergic), and he soon found himself sinking into a state of anaphylactic shock.[4] Walter Larosee (Larosee), a

---

1. The plaintiff sued in both an individual capacity and as administrator of her husband's estate.

2. *E.g.*, G.L.1956 § 9–1–27.1 ("[n]o person who voluntarily and gratuitously renders emergency assistance to a person in need thereof *including the administration of life-saving treatment to those persons suffering from anaphylactic shock* shall be liable for civil damages which result from acts or omissions by such persons rendering the emergency care, which may constitute ordinary negligence" (emphasis added)). We note that the emphasized anaphylactic-shock reference in § 9–1–27.1 was added by a June 19, 1995 amendment, *see* P.L.1995, ch. 51, §§ 1, 2,

after the incident giving rise to this action and would thus be inapplicable to this lawsuit in any event.

3. *See Marr Scaffolding Co. v. Fairground Forms, Inc.*, 682 A.2d 455, 457 (R.I.1996).

4. An anaphylactic shock is defined as

"[a] sudden, severe allergic reaction characterized by a sharp drop in blood pressure, urticaria, and breathing difficulties that is caused by the injection of a foreign substance, such as a drug or bee venom, into the body after a preliminary or sensitizing injection.

physician's assistant, was the first person to come to his aid. Larosee was a patron of the festival and is a codefendant in the consolidated action below. After receiving notice that "there was a man having a problem on the hill," Dr. John and other members of the festival's first-aid crew left the first-aid tent to go to this area and render emergency assistance. Nurse Champoux, however, stayed at the tent because "someone had to remain" there.

Doctor John testified at her deposition that when she first approached Boccasile, he was still standing under his own power. She identified herself as a doctor and a member of the festival's first-aid crew. When she asked Boccasile whether he needed any help, he replied that he had eaten some seafood and that he was having an allergic reaction. He then said that he needed a shot. Dr. John asked him to accompany her to the first-aid tent, but he replied that he was unable to do so. He then sat down on the ground and again stated that he needed a shot. Although Boccasile did not tell Dr. John what kind of a shot he needed, she knew that either adrenaline or benadryl would increase the rate and output of his heart and thereby help to counteract the allergic reaction he was experiencing. While Dr. John stayed with Boccasile, other members of the crew returned to the first-aid tent to locate an adrenaline injector and to call an ambulance.

While waiting for the injector, Dr. John continued to speak with Boccasile. She again tried, unsuccessfully, to have him return with her to the first-aid tent. She felt his pulse and found it to be "somewhat rapid and thready." Doctor John also observed that he was talking in full sentences without difficulty and was not "retracting or using any accessory muscles to breath[e]." He was not wheezing, gasping, or coughing, and he showed no signs of respiratory distress. In a couple of minutes, a person returned with an Epipen, a penlike, spring-loaded, single-dose injector used to administer epinephrine, an adrenaline solution, to persons suffering from

anaphylaxis. After verifying that the device given to her was indeed what she thought it was, Dr. John administered it by injecting the medicine into Boccasile's exposed thigh. She asked for a second injector, but none was available.

Meanwhile, back at the first-aid tent, Nurse Champoux had been wondering what was going on out in the field. After another member of the first-aid crew arrived at the tent, Nurse Champoux was finally free to leave her post. Immediately she went to the scene to see if she could be of assistance. Beyond learning that "a man was down," Nurse Champoux knew nothing about Boccasile's condition before she arrived on the scene and saw him lying there on the ground. By this time others had already come to Boccasile's aid, and Dr. John had already administered the Epipen injection. Told that an ambulance had been called, Nurse Champoux remained with Boccasile until the rescue vehicle arrived.

After Dr. John injected him with the Epipen, Boccasile complained that he felt worse and continued to request a shot. When told by Dr. John that she had already given him an injection, Boccasile said that he still did not feel it. Because she lacked any other injectors, Dr. John then attempted to readminister the Epipen injection into Boccasile's thigh. After doing so, she testified that the Epipen felt as if it fired a second time and that "I was doing the most I could in a situation where I did not have anything else and where I know that there is residual fluid in the unit in the hope that it might fire a second time."

Boccasile again stated that he was unable to feel this second shot. He told Dr. John that he could not catch his breath and said, "I am going." Then his eyes rolled upward, and he lost consciousness. After determining that Boccasile had no pulse and was not breathing, Dr. John began mouth-to-mouth resuscitation. She requested between breaths that one of the bystanders obtain a knife and/or a spoon. Doctor John testified that "Dr. Larosee, as I understood him to be,

The reaction may be fatal if emergency treatment, including the administration of epinephrine injections, is not given immediately. Also called *anaphylaxis.*" The American Heritage Dictionary of the English Language 66 (3d ed.1996).

began chest compressions" and that "[h]e seemed quite at ease with it."[5] Unfortunately although she briefly got a pulse, Dr. John did not get any respirations and was unable to revive Boccasile.

After the ambulance arrived, Boccasile was placed on a stretcher. Doctor John then "had a split second discussion with Dr. Larosee saying, do you want to go with him or should I, are you comfortable going. He said, sure, I will go. And I said, good, that way I can stay here with the remaining some thousand people here. At no time did Dr. Larosee say to me, gee, maybe you should go, Doc, I am not a doctor, I am a physician's assistant or, gee, I don't know what to do, I am a psychiatrist, I haven't run a code in 10 years. He said, sure, I will go."

Knowing that Boccasile needed a hospital emergency department and "a supply of very advanced life support materials that would ordinarily not be found in a first-aid location" and believing that there was no reason why additional medication could not be administered en route, Dr. John did not delay Boccasile's departure. Unfortunately, despite the medical efforts made en route and at the hospital, Boccasile never regained consciousness and died the next day.

Thereafter, plaintiff sued defendants and others in the Superior Court, alleging wrongful death, loss of consortium, and "negligence, including gross, willful and wanton negligence * * * in rendering medical assistance to the decedent, * * * both in acts and omissions." After engaging in discovery, Dr. John and Nurse Champoux separately moved for summary judgment, relying on Rhode Island's good-Samaritan statutes. After a hearing, a motion justice granted Dr. John's motion. He concluded that she was a medical volunteer rendering gratuitous services and therefore entitled to the protection of the good-Samaritan statutes. He also determined that the "undisputed facts which don't even support so much as mere negligence on the part of this physician, can scarcely be said to support gross negligence." Another motion justice also granted Nurse Champoux's motion, ruling that she "falls clearly

within the purview of the statute [G.L.1956 § 5–34–34] and there is no fact issue with respect to gross negligence." Pursuant to Super. R. Civ. P. 54(b), final judgments entered for each defendant, and plaintiff filed separate appeals, which were then consolidated.

In her answers to Dr. John's interrogatories, plaintiff claimed that Dr. John inadequately responded to Boccasile's condition because she initially went to attend to him without bringing any medical equipment with her. Thus, she alleged that Dr. John negligently and fatally delayed the administration of epinephrine to her husband. She also alleged that Dr. John "failed to administer sufficient epinephrine for decedent's condition and failed to establish an adequate airway." The plaintiff further alleged that Dr. John "totally failed to check" on the medical equipment available in the first-aid tent and "failed to accompany" Boccasile in the rescue. With respect to Nurse Champoux, plaintiff alleged that she responded inadequately to the medical emergency by arriving at the scene without any medical equipment, thereby delaying the administration of epinephrine. However, in response to defendants' summary-judgment motions, plaintiff failed to come forward with any expert medical support for these conclusory accusations of negligence. Such a failure is fatal to alleged medical-negligence claims like these against professional health-care providers.

## Analysis

■ "In an action for wrongful death, the plaintiff must, as in any other negligence suit, introduce competent evidence to establish a causal relationship between the defendant's act or omission and the injuries resulting in decedent's death." *Allen v. State*, 420 A.2d 70, 72 (R.I.1980). Moreover, a plaintiff must " 'establish a standard of care as well as a deviation from that standard.' " *Sousa v. Chaset*, 519 A.2d 1132, 1135 (R.I.1987) ("[e]xpert testimony is needed to explain * * * *what proper procedures and alternatives are available* to a physician * * * [and] why the procedures followed by the defendant physi-

---

5. According to Dr. John, Larosee identified him-

self to her as "Dr. Larosee."

cian were negligent, *and not legitimate*, alternatives"); *see also Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 514, 382 A.2d 514, 516–17 (1977) ("[i]n any negligence action, such as a medical malpractice case, it is the plaintiff's burden to establish that the defendant had a duty to act or refrain from acting and that there was a causal relation between the act or omission of the defendant and the injury to the plaintiff"). In that regard, "expert testimony is required to establish deviation from the standard of care when the lack of care is not so evident as to be obvious to a lay person." *Richardson v. Fuchs*, 523 A.2d 445, 450 (R.I. 1987). "The expert must measure the care that was administered against the degree of care and skill ordinarily employed in like cases by physicians in good standing engaged in the same type of practice in similar localities." *Id.* at 448.

■ Likewise, "[w]here the alleged negligence involves the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." *Ramage v. Central Ohio Emergency Services, Inc.*, 64 Ohio St.3d 97, 592 N.E.2d 828, 834 (1992); *see also Leonard v. Providence Hospital*, 590 So.2d 906, 908 (Ala.1991) ("when there is no medical order requiring a certain type of treatment or precaution, it becomes a question of proper nursing practice and care * * * [and][e]xpert testimony is needed to establish the degree of 'care, skill and diligence' used by 'similarly situated health care providers in the same general line of practice' ").[6]

■ Confronted with properly supported motions for summary judgment, plaintiff could not simply fall back on her pleadings and interrogatory answers and assert that she should be allowed the chance to prove her claims at trial. Rather she had the affirmative duty in opposing defendants' summary-judgment motions to present evidence by affidavit or otherwise to demonstrate the existence of a genuine issue of material fact. *See* Super. R. Civ. P. 56(e) ("[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations * * * of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"); *see also Harritos v. Cambio*, 683 A.2d 359, 360 (R.I.1996).

■ Here, the plaintiff alleged that both Dr. John and Nurse Champoux were negligent in rendering emergency medical assistance to her husband. However, in response to the summary-judgment motions, she failed to come forward with any standard-of-care evidence, any medical affidavits establishing alleged deviations from those standards, or any expert attributions of causation between the negligence alleged and her late husband's most unfortunate death. Apparently, the plaintiff believed that each defendant's alleged lack of care was so obvious as to negate any need for such expert medical affidavits—at least at this pretrial stage of the proceedings. But we have repeatedly held otherwise when, as here, the proper medical treatment of a patient's condition is not obvi-

---

**6.** We note that for present purposes it does not matter whether a lawsuit against a nurse is characterized as a medical-malpractice claim, *see Vigue v. John E. Fogarty Memorial Hospital*, 481 A.2d 1 (R.I.1984) (affirming dismissal of "medical malpractice" claim against nurse because it was time barred pursuant to G.L.1956 § 9–1–14.1 (the medical-malpractice limitations period), notwithstanding a dissent arguing that "[i]t appears to be the unanimous holding in states with similar statutes of limitations for medical-malpractice claims that the negligence of a nurse constitutes ordinary negligence rather than medical malpractice," 481 A.2d at 6), or as an ordinary negligence action, *see Ramage v. Central*

*Ohio Emergency Services, Inc.*, 64 Ohio St.3d 97, 592 N.E.2d 828, 833 (1992) ("[a]lthough this court has previously held that an action filed against a nurse in his or her professional capacity does not fall within the traditional definition of 'malpractice,' * * * we conclude that expert testimony is necessary to establish the prevailing standard of care where the professional skills and judgment of a nurse are alleged to be deficient"). No matter which way these claims are labeled, the dispositive issue here is that Nurse Champoux's conduct cannot be assessed for negligence without the assistance of expert testimony.

ous to a lay person and thus lies beyond common knowledge. *See Sousa,* 519 A.2d at 1135 ("plaintiff's urological condition, and the treatment he received or should have received for the same, were matters beyond the obvious common knowledge of the jury"); *Young v. Park,* 417 A.2d 889, 893 (R.I.1980) ("[w]e have no hesitation in ruling that matters concerning polycythemia and Myleran therapy are not so obvious that the need for expert testimony is obviated"), *cert. denied,* 449 U.S. 1119, 101 S.Ct. 933, 67 L.Ed.2d 106 (1981); *Marshall v. Tomaselli,* 118 R.I. 190, 197, 372 A.2d 1280, 1284 (1977) ("the treatment of plaintiff's condition is neither sufficiently common nor sufficiently nontechnical that a layma[n] could be expected to appraise it"). There was simply no evidence presented to the motion justices that would have established an applicable standard of care against which each defendant's conduct could be measured. Similarly, the plaintiff offered no evidence to substantiate whether any deviations from those standards occurred here, nor did she show how any alleged deviations from the applicable standard of care proximately caused Boccasile's death.

### Conclusion

For the foregoing reasons the plaintiff's appeal is denied and dismissed, and the judgments of the Superior Court are affirmed.