Martin MALINOU, Individually and as Executor of the Estate of Etta E. Malinou and as Executor of the Estate of Sheldon Malinou

v.

The MIRIAM HOSPITAL et al.

No. 2009–87–Appeal.

Supreme Court of Rhode Island.

June 24, 2011.

Martin Malinou, Pro Se.

Scott D. Levesque, Esq., Michael G. Sarli, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The plaintiff, Martin Malinou,[1] appeals *pro se* from a Superior Court summary judgment in favor of the defendants, The Miriam Hospital (Miriam Hospital), Steven M. Kempner, M.D. (Dr. Kempner), Jean Mary Siddall–Bensson, M.D. (Dr. Siddall–Bensson), Lifespan Corporation, Coastal Medical, Inc. (Coastal Medical), Johanna LaManna, R.N. (Nurse LaManna), Randall S. Pellish, M.D. (Dr. Pellish), Rhode Island Hospital, Evelyn Asante, R.N. (Nurse Asante), Patricia Brown, R.N. (Nurse Brown), and Michael Capicotto, M.D. (Dr. Capicotto) (collectively defendants). This wrongful death and medical negligence action arises out of the medical care provided to the plaintiff's mother, Etta E. Malinou, during her stay at Miriam Hospital from her admission on January 10, 2003 to the evening she passed away on January 13, 2003. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After reviewing the record and considering the parties' written and oral submissions, we are satisfied that this appeal may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

In January 2003, Etta E. Malinou was ninety-four years old and suffering from a number of health issues. She had a documented history of dysphagia, which is defined as difficulty in swallowing. Stedman's Medical Dictionary 554 (27th ed. 2000). Mrs. Malinou also suffered from dementia. Her medical condition required daily assistance, most of which was rendered by plaintiff. In 2002, Mrs. Malinou's condition deteriorated, and her healthcare providers discussed with plaintiff certain healthcare options, including hospice care. The plaintiff declined hospice care and indicated that he would care for his mother himself. The plaintiff also declined to authorize any alternative manner of nourishment for his mother, such as the placement of a gastric feeding tube. Mrs. Malinou was placed on a strict dysphagia diet, on which she remained until her death. The plaintiff was trained in dysphagia feeding and fed his mother most of her daily meals.

On January 10, 2003, Mrs. Malinou was brought to the Miriam Hospital emergency room with complaints of an "alteration in mental status." She was admitted by defendant Dr. Capicotto, an employee of defendant Coastal Medical, and was treated for a presumed urinary tract infection as the source of her mental status change. According to plaintiff, Dr. Capicotto ordered a speech and swallow evaluation. After initial treatment, Mrs. Malinou's con-

---

1. The plaintiff is a licensed attorney who filed the instant lawsuit individually and in his capacity as executor of the estates of Sheldon and Etta E. Malinou.

dition improved, and she continued to tolerate her normal dysphagia diet without difficulty. On January 11 and January 12, 2003, Mrs. Malinou was examined by defendant Dr. Kempner, a Coastal Medical employee. Doctor Kempner decided on January 12, 2003, that Mrs. Malinou "would likely be discharged" the next day, January 13, 2003.

According to plaintiff, he first became aware of a possible problem with his mother's medical condition on the evening of January 12, 2003, when he spoke with defendant Nurse Brown, a Miriam Hospital employee. The plaintiff stated in his deposition that Nurse Brown informed him that she heard crackling in Mrs. Malinou's lungs and that she would call defendant Dr. Pellish,[2] an on-call physician covering for Coastal Medical on the overnight shift of January 12 to 13, 2003. Nurse Brown was relieved by defendant Nurse LaManna, a Miriam Hospital employee, in the early morning of January 13, 2003. In monitoring Mrs. Malinou, Nurse LaManna noted that her urinary output was low and notified a physician of her findings.

On January 13, 2003, plaintiff was present in his mother's hospital room while she was being fed lunch by defendant Nurse Asante, an employee of Miriam Hospital. The plaintiff watched at his mother's bedside as the nurse fed her. At the time, plaintiff did not observe any difficulties in the feeding process. According to plaintiff, approximately five seconds after Nurse Asante finished feeding Mrs. Malinou, plaintiff noticed "a look of death" in his mother's eyes. Shortly thereafter, Mrs. Malinou became unresponsive. The medical staff responded and respiration was revived. Blood gas tests performed at the time indicated that Mrs. Malinou was in severe respiratory failure. The plaintiff stated that he was told that if his mother survived the episode, "there would be no quality to her life, [she would] basically [be] a vegetable." Unsatisfied, plaintiff demanded that the tests be repeated. Second blood gas tests were performed, and the new results confirmed the original very grave prognosis. Mrs. Malinou's treatment team was "not clear [on] exactly what had happened," but it believed that she suffered from respiratory failure with possible causes of aspiration, pulmonary embolus, or cerebrovascular accident. After discussions with his brother and further consultation with the medical staff, plaintiff decided against the use of "heroic measures" and agreed with the medical staff that life support should be removed.[3] Mrs. Malinou passed away on the evening of January 13, 2003.

Shortly thereafter, defendant Dr. Siddall–Bensson, a resident at Miriam Hospital, discussed with plaintiff the possibility of performing an autopsy on Mrs. Malinou. According to plaintiff, Dr. Siddall–Bensson told him that she was required by law to offer an autopsy, but that it was unlikely that an autopsy would be helpful. The plaintiff indicated in his deposition that, based on the information available to him at the time, he had been led to believe that his mother's death was the result of respiratory failure brought on by pneumonia, which had not been detected by earlier tests. The plaintiff did not request an autopsy and one was not performed. Doctor Siddall–Bensson certified Mrs. Malinou's death certificate, which listed respi-

---

**2.** At the time of the events at issue, Dr. Pellish was serving in a residency program overseen by defendant Rhode Island Hospital.

**3.** The plaintiff possessed a healthcare power of attorney that gave him unlimited authority to make decisions concerning his mother's medical care and treatment.

ratory failure caused by pneumonia as the cause of death.

On January 13, 2006, plaintiff filed a complaint against defendants,[4] alleging that negligent medical care in connection with his mother's stay at Miriam Hospital in January 2003 resulted in her death on January 13, 2003. Thereafter, the parties initiated discovery. On May 21, 2007, the Superior Court entered a scheduling order requiring that all fact discovery be concluded by September 15, 2007, that plaintiff disclose his expert witnesses by November 15, 2007, and that depositions of plaintiff's experts be concluded by March 15, 2008. Subsequently, plaintiff moved to amend the scheduling order on several different occasions. After hearings on plaintiff's first and second requests to amend the scheduling order, a Superior Court justice (motion justice)[5] granted each motion, ultimately extending the deadline for fact discovery to January 30, 2008, requiring that plaintiff's experts be disclosed by March 1, 2008, and extending the deadline for plaintiff's experts to be deposed to August 1, 2008.

On February 13, 2008, a hearing was held before the motion justice on plaintiff's third motion to amend the scheduling order. The plaintiff sought a two-month extension on factual discovery and on disclosure of his expert witnesses because he had not yet received certain medical records. Having already granted plaintiff's two prior extension requests, the motion justice expressed concern that she was "pushing the line on [her] discretion." The motion justice decided that

plaintiff had been given ample opportunity to conduct discovery and that the deadline for fact discovery would not be extended further; however, defendants still were required to answer any outstanding discovery requests. The motion justice also declined to extend the deadline for disclosure of plaintiff's standard of care experts. The only extension granted was a nineteen-day extension for plaintiff to disclose all causation experts by March 19, 2008.

Thereafter, plaintiff identified three expert witnesses: Theresa T. Buchanan, R.N. (Nurse Buchanan); Maureen Polsby, M.D. (Dr. Polsby); and Dennis C. Tanner, Ph.D. (Professor Tanner). On June 23, 2008, Dr. Polsby was deposed for several hours, after which the parties agreed to suspend the deposition until a later date. Difficulties with respect to scheduling Dr. Polsby's continued deposition led plaintiff to file a motion for a protective order to prevent the deposition of Dr. Polsby from being completed on July 18, 2008, the date selected by defendants. On July 1, 2008, more than three months after the March 19, 2008 deadline for disclosure of plaintiffs causation experts, plaintiff named an additional causation expert, Thomas Andrew, M.D. (Dr. Andrew). The defendants then moved to strike Dr. Andrew as an expert witness on the ground that plaintiff did not disclose him in a timely fashion.

A hearing on defendants' motion to strike and on plaintiff's motion for a protective order was held on July 16, 2008. The motion justice denied defendants' motions to strike Dr. Andrew as an expert

---

4. The complaint also listed as a defendant Amcom Software, Inc.; however, the Superior Court granted summary judgment in favor of Amcom and final judgment was entered on June 11, 2008, from which plaintiff did not appeal. Therefore, Amcom is not a party to this appeal.

5. On appeal, plaintiff's claims of error arise from the orders of two Superior Court justices. The first justice heard various pretrial motions and shall be referred to as the motion justice. On October 30, 2008, the case was assigned to another Superior Court justice for trial. We shall refer to this second justice as the trial justice.

witness, but ordered that, if his deposition was not concluded by August 8, 2008, his testimony would be precluded at trial. With regard to the completion of Dr. Polsby's deposition, the motion justice ordered that, if her deposition was not completed by July 31, 2008, Dr. Polsby's testimony also would be precluded at trial.[6] Two days later, a different Superior Court justice assigned the case to a "date certain" trial date of November 17, 2008.

After the hearing on July 16, 2008, the parties continued to encounter difficulties in scheduling the depositions of plaintiff's expert witnesses. Ultimately, the depositions of Dr. Polsby and Dr. Andrew were not completed by the court-ordered deadlines. In August 2008, plaintiff filed both a motion to reconsider the court's orders imposing the deadlines for the depositions of Dr. Polsby and Dr. Andrew and a motion to amend the scheduling order seeking the same relief. At a hearing on plaintiff's motions, on September 4, 2008, plaintiff stated that he informed Dr. Polsby about the court's order imposing the deadline for her deposition, but that Dr. Polsby indicated that she would not be available until she returned from vacation in August 2008. With regard to Dr. Andrew, plaintiff presented a series of e-mails showing that plaintiff had contacted him by e-mail to determine when he would be available for a deposition; however, plaintiff never informed Dr. Andrew in their e-mail correspondence of the court-ordered deadline for his deposition.

Although the motion justice acknowledged plaintiff's statement that there was "no willfulness on [his] part * * * not to comply with [the court's] orders," she opined that plaintiff's "chronic problem" in complying with discovery deadlines was "somewhat self-induced." The motion justice denied both of plaintiff's motions, citing the numerous extensions that she already had granted. A corresponding order was entered on September 15, 2008, thereby precluding Dr. Polsby and Dr. Andrew from testifying at trial.

Thereafter, plaintiff filed a petition for writ of certiorari in this Court, challenging the Superior Court orders that resulted in the preclusion of Dr. Polsby's and Dr. Andrew's testimonies. This Court denied plaintiff's petition for writ of certiorari.

After entry of the Superior Court's order of September 15, 2008, defendants all filed motions for summary judgment on the grounds that plaintiff's claims were not supported by competent expert testimony and that plaintiff could not meet his burden of proof on the issues of breach of the standard of care and causation.[7] The plaintiff objected to defendants' motions for summary judgment and raised a variety of arguments in support of his allegations that his mother's death was the result of negligent medical care. The plaintiff alleged that his mother was improperly fed her lunch on January 13, 2003, and that, as a direct result, she aspirated[8] her food, causing her to pass away shortly thereafter.

---

**6.** Although the court's order imposed a July 31, 2008 deadline for the completion of Dr. Polsby's deposition, we note that the court's previous scheduling order required that plaintiff's experts be deposed by August 1, 2008.

**7.** Coastal Medical, Dr. Kempner, and Dr. Capicotto each filed separate motions for summary judgment. A fourth motion for summary judgment was jointly filed by Miriam Hospital, Lifespan Corporation, Nurse

LaManna, Rhode Island Hospital, Dr. Siddall–Bensson, Dr. Pellish, Nurse Asante, and Nurse Brown.

**8.** Aspiration is defined as "[t]he inspiratory sucking into the airways of fluid or any foreign material, especially gastric contents or food." Stedman's Medical Dictionary 156 (27th ed. 2000). The plaintiff averred that his mother was silently aspirating her lunch as she was fed by Nurse Asante on January 13,

First, plaintiff argued that Dr. Capicotto breached the standard of care by allegedly ordering a speech and swallow evaluation but failing to ensure that the evaluation was, in fact, performed. The plaintiff next contended that Dr. Pellish breached the standard of care by failing to examine Mrs. Malinou during the overnight hours of January 12 to 13, 2003, after Nurse Brown contacted him about crackling in Mrs. Malinou's lungs. The plaintiff argued that Dr. Kempner also breached the standard of care by failing to ensure that a speech and swallow evaluation was performed and by failing to examine his mother after lung crackling was noted by Nurse Brown. Further, plaintiff maintained that Nurse LaManna and Nurse Brown did not meet the standard of care because they failed to secure an examination of Mrs. Malinou during the overnight hours of January 12 to 13, 2003. The plaintiff also alleged that Nurse Asante breached the standard of care by feeding Mrs. Malinou her lunch on January 13, 2003, without first having the speech pathology department examine her ability to swallow. Additionally, plaintiff requested that the court adopt a judicially determined standard of care that would eliminate the need for plaintiff to introduce expert testimony to establish the standard of care and a breach of that standard.

Next, plaintiff argued that defendant Lifespan Corporation, a company that operates Miriam Hospital, knowingly destroyed records of telephone calls made by Miriam Hospital staff during Mrs. Malinou's admission, in anticipation of litigation. In addition, plaintiff alleged that Dr. Siddall–Bensson filed a false death certificate by improperly failing to indicate that Mrs. Malinou's death was an "accident" and for failing to disclose "the uncertainty of the cause of death." According to plaintiff, Dr. Siddall–Bensson was required by G.L. 1956 § 23–4–7 [9] to report Mrs. Malinou's death to the state medical examiner, and he alleged that her failure to do so amounted to "spoliation of evidence" because it prevented an autopsy from being performed. Finally, plaintiff suggested that Mrs. Malinou "lost a chance to survive" when defendants failed to order a neurological examination after the medical crisis occurred on January 13, 2003.[10]

The parties agreed that defendants' motions for summary judgment should be heard prior to the commencement of trial. A Superior Court justice (trial justice) heard arguments on those motions on November 19, 2008.

In her bench decision, the trial justice stated that in a medical negligence and wrongful death case, "it is the plaintiff's burden to establish that the defendant had the duty to act or refrain from acting and that there was a causal relationship between the act or omission of the defendant and the injury to the party." Moreover, she noted that "expert testimony [is required] to establish a deviation from the standard of care when the lack of care is not so evident as to be obvious to a lay person." The trial justice then concluded

2003, and that silent aspiration caused his mother's respiratory failure.

9. The plaintiff relies on G.L.1956 § 23–4–7(a)(1), which requires reporting a death that occurs in an "unusual manner," as well as § 23–4–7(c), which requires reporting a death that occurs in any "unnatural manner, or as the apparent result of the negligence of another person."

10. In addition to the aforementioned allegations, plaintiff asserted that Miriam Hospital acted negligently through its employees Nurses LaManna, Brown and Asante; Coastal Medical acted negligently through its employees Dr. Kempner and Dr. Capicotto; and Rhode Island Hospital was negligent in overseeing Mrs. Malinou's treatment under its residency program.

that the alleged negligence in this case involved technical medical issues of the standard of care and causation that required the testimony of expert witnesses. Therefore, the trial justice rejected plaintiff's request that the court adopt a judicially determined standard of care that would not require expert testimony.

The trial justice next noted that, as a result of the court's previous orders, plaintiff was precluded from using Dr. Polsby and Dr. Andrew as expert witnesses. Consequently, plaintiff was left with two expert witnesses: Nurse Buchanan, a registered nurse, and Professor Tanner, a speech pathologist and professor of health sciences. The trial justice expressed serious reservations about whether Nurse Buchanan and Professor Tanner would qualify as expert medical witnesses in this case; however, for purposes of the summary judgment motions, she assumed that both would qualify as experts. The trial justice then reviewed the deposition testimonies of Nurse Buchanan and Professor Tanner.

With regard to defendants Nurse La-Manna, Nurse Brown, and Nurse Asante, the trial justice concluded that "[i]t is clear from reviewing [Nurse Buchanan's] testimony that [she] cannot testify with any degree of medical certainty as to a standard of care[,] deviation from that care[,] or causation." The trial justice also noted that Nurse Buchanan herself stated that she was not qualified to render an opinion on the standard of care for defendant physicians in this case.

In reviewing the testimony of Professor Tanner, the trial justice noted that Professor Tanner acknowledged that he could not testify about the standard of care for a physician or a nurse. Instead, the trial justice determined, the standard of care relied upon by Professor Tanner was the standard of care for speech pathologists. According to the trial justice, Professor Tanner testified in very general terms that the medical care provided to Mrs. Malinou was somehow deficient. Therefore, the trial justice concluded, Professor Tanner could not testify with a reasonable degree of medical certainty about the appropriate standard of care or causation.

Having found the testimony of plaintiff's expert witnesses insufficient to raise a question of fact as to plaintiff's medical negligence claims, the trial justice next considered plaintiff's alternate arguments. She ruled that even if the court adopted the "loss of chance" theory of recovery (and even if plaintiff had established a breach of the standard of care), plaintiff still would need to prove that the alleged negligence was a proximate cause of Mrs. Malinou's lost chance for a better outcome, and she ruled that plaintiff had failed to present the expert testimony necessary to establish causation. The trial justice further ruled that the doctrine of spoliation of evidence did not apply in this case because there was no evidence of deliberate or negligent destruction of evidence. She also concluded that Dr. Siddall–Bensson did not breach any duty or violate any statute in preparing Mrs. Malinou's death certificate. The trial justice next found that there was no evidence that Lifespan Corporation was negligent in maintaining the communications system at the hospital. Finally, she dismissed plaintiff's loss of society and companionship argument on the ground that it was derivative of the deficient medical negligence claim.

The trial justice granted summary judgment in favor of all defendants. Final judgment entered on November 26, 2008, from which plaintiff timely appealed.

## II

### Discussion

On appeal, plaintiff raises several arguments. The plaintiff first argues that the

motion justice erred in precluding Dr. Polsby and Dr. Andrew from testifying at trial. Next, plaintiff contends that the trial justice erred in granting summary judgment in favor of defendants because the evidence establishes a genuine issue of material fact about whether defendants breached the standard of care, thereby causing Mrs. Malinou's death. In addition, plaintiff argues that the doctrine of loss of chance establishes that defendants caused Mrs. Malinou's death. The plaintiff next argues that the court should adopt a judicially determined standard of care that would not require the testimony of expert witnesses. Further, plaintiff maintains that he has viable causes of action against defendants for loss of society and companionship and for negligent infliction of emotional distress, as well as against Dr. Siddall–Bensson for filing a false death certificate. Lastly, plaintiff contends that the trial justice erred in granting summary judgment in favor of Lifespan Corporation because it "destr[oyed] * * * telephone records in anticipation of this litigation."

## A

### Preclusion Orders

■ The plaintiff first argues that the Superior Court erred in precluding Dr. Polsby and Dr. Andrew from testifying at trial. The plaintiff maintains that the motion justice issued the preclusion orders based upon an erroneous interpretation of Rules 26(b)(4)(A) and (d) of the Superior Court Rules of Civil Procedure. According to plaintiff, the motion justice interpreted Rules 26(b)(4)(A) and (d) as re-

quiring the taking of plaintiff's medical experts' depositions by defendants before defendants' experts were deposed by plaintiff. This argument is without merit.

The timeline for taking depositions in this case was established when the motion justice granted a motion for entry of a scheduling order filed by Dr. Kempner pursuant to Rule 26(b)(4).[11] Once the court entered the scheduling order, the parties became bound to comply with the sequence and timing for discovery set forth in that scheduling order and subsequent court orders. Our review of the record satisfies us that the motion justice precluded Dr. Polsby and Dr. Andrew from testifying, not because of any misinterpretation of Rule 26, as plaintiff alleges, but rather because of plaintiff's noncompliance with the court's discovery orders.

■ Rule 37(b)(2) of the Superior Court Rules of Civil Procedure "provides the court with a variety of sanctions that may be imposed on a party who has failed to comply with an order to provide discovery." *Flanagan v. Blair*, 882 A.2d 569, 572–73 (R.I.2005). "The decision to impose a particular sanction is within the sound discretion of the trial court." *International Depository, Inc. v. State*, 603 A.2d 1119, 1124 (R.I.1992). "The trial justice selects the sanction he or she believes is '[the] most appropriate [one] for the situation in question.'" *Id.* (quoting *Margadonna v. Otis Elevator Co.*, 542 A.2d 232, 233 (R.I. 1988)). One of the sanctions that is available to the court in appropriate circumstances is the preclusion of a party's expert witness from testifying at trial. *See* Rule 37(b)(2)(B).[12] "The imposition of

11. Rule 26(b)(4)(A) of the Superior Court Rules of Civil Procedure states in pertinent part: "In the absence of agreement between the parties as to the timing of [expert] disclosures required under this subdivision, any party may apply to the court for an order

establishing a schedule of such interrogatories, responses, and depositions."

12. Under Rule 37(b)(2)(B) of the Superior Court Rules of Civil Procedure, if a party or a witness designated to testify on behalf of a

sanctions under Rule 37 will be overturned only upon a showing of an abuse of discretion by the trial justice." *Goulet v. Office-Max, Inc.,* 843 A.2d 494, 496 (R.I.2004) (mem.).

The plaintiff argues that preclusion orders were not appropriate sanctions in this case. He contends that defendants failed to show that prejudice would result from further extensions of time for the completion of Dr. Polsby's and Dr. Andrew's depositions, and that therefore his expert witnesses should not have been precluded from testifying.

The plaintiff further argues that his noncompliance with the discovery orders was the result of the unavailability of Dr. Polsby and Dr. Andrew for depositions, which was beyond his control. The plaintiff cites this Court's opinion in *Allen v. South County Hospital,* 945 A.2d 289 (R.I.2008), for the premise that the Court supports "not sanctioning a party whose expert does not comply with court orders scheduling testimony." In *Allen,* 945 A.2d at 290–91, the plaintiff's primary expert witness unexpectedly abandoned the plaintiff's claim just weeks before trial and after several years of preparation. After the plaintiff unsuccessfully attempted to secure a replacement witness in the little time remaining before trial, the trial justice dismissed the case for lack of prosecution. *Id.* Soon thereafter, the plaintiff was contacted by another potential expert witness who indicated that he would be willing to testify on her behalf. *Id.* The plaintiff then filed a motion to vacate judgment under Rule 60(b)(6) of the Superior Court Rules of Civil Procedure, which initially was granted subject to certain conditions, including the pecuniary condition that the plaintiff post a corporate surety bond for

$60,000 to secure payment for the defendants' anticipated costs and fees. *Allen,* 945 A.2d at 290–91. After the plaintiff was unable to post the $60,000 bond, the motion to vacate was then deemed denied. *Id.* On appeal, this Court affirmed the trial court's judgment dismissing the plaintiff's complaint; however, this Court also affirmed the initial order vacating said judgment subject to new conditions as modified by the Court's opinion. *Id.* at 297. We reasoned that "[a]ccess to our courts ought not depend upon pecuniary preconditions." *Id.* at 296. We also noted that "the loss of plaintiff's primary expert witness at the eleventh hour indeed created extraordinary circumstances warranting the vacation of the judgment of dismissal." *Id.* at 297. The *Allen* case is inapposite to the case at bar.

In this case, the motion justice twice granted plaintiff's motions to amend the scheduling order, over defendants' objections, ultimately extending the deadline for plaintiff's experts to be deposed to August 1, 2008 from the initial deadline of March 15, 2008. Moreover, the motion justice granted extensions on three different occasions for plaintiff to disclose his expert witnesses. After plaintiff identified Dr. Andrew, more than three months past the deadline for expert disclosure, the motion justice nonetheless denied defendants' motions to strike Dr. Andrew as a witness, thereby permitting him to be added as an expert. At a July 16, 2008 hearing on defendants' motions to strike, the motion justice ordered that Dr. Andrew be deposed by August 8, 2008, and that Dr. Polsby's deposition be concluded by July 31, 2008. The motion justice expressly cautioned plaintiff against further noncompliance with court-imposed deadlines and

party "fails or refuses to obey an order to provide or permit discovery," the court, in its discretion, may issue sanctions, including

"[a]n order * * * prohibiting the disobedient party from introducing designated matters in evidence."

warned him that Dr. Andrew and Dr. Polsby would be precluded from testifying at trial if their depositions were not completed by said dates.

Despite the motion justice's warning and the repeated attempts by defendants to establish deposition dates, plaintiff failed to produce Dr. Polsby and Dr. Andrew for depositions by the court-ordered deadlines. Instead, plaintiff again moved to amend the scheduling order and filed a motion to reconsider the court's orders imposing the expired deadlines for completion of Dr. Polsby's and Dr. Andrew's depositions. After a hearing, both of plaintiff's motions were denied on September 15, 2008, and Dr. Polsby and Dr. Andrew were thereby precluded as experts in accordance with the court's prior orders. The motion justice carefully considered the circumstances before issuing the preclusion orders, stating:

> "I'm never happy issuing preclusion orders because I believe firmly that we ought to try everything on its merits and let our juries decide. But, we had had multiple amendments of this scheduling order. This case was filed on the eve of the statute of limitations. There's been nothing but difficulty in coming up with the names of the expert witnesses. And, I think there was even some amendment to your expert disclosure at the eleventh hour and outside the last scheduling order. I don't know what more I can do. I mean, these defendants are entitled—were entitled to all of this information."

The record indicates that plaintiff was given ample opportunity over the course of several months to comply with his discovery obligations. The plaintiff's delay in this case is quite different from the situation in *Allen*, in which the plaintiff was left without an expert witness because of circumstances entirely beyond her control.

Despite multiple extensions to scheduling orders, which were generously granted at plaintiff's request, and despite an express warning from the motion justice, plaintiff failed to timely produce Dr. Polsby and Dr. Andrew for depositions. Given plaintiff's repeated noncompliance with discovery orders, we cannot say that the motion justice abused her discretion under Rule 37(b)(2)(B) by precluding Dr. Polsby and Dr. Andrew from testifying as expert witnesses.

## B

### Summary Judgment

#### 1. Medical Negligence and Wrongful Death

█ The plaintiff next argues that the Superior Court erred in granting summary judgment in favor of defendants because there are genuine issues of material fact about the applicable standard of care and about whether defendants breached that standard, thereby causing Mrs. Malinou's death.

█ "It is well settled that this Court reviews the granting of a summary judgment motion on a *de novo* basis." *Rhode Island Insurers' Insolvency Fund v. Leviton Manufacturing Co.*, 763 A.2d 590, 594 (R.I.2000). "[W]e will affirm a summary judgment if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Poulin v. Custom Craft, Inc.*, 996 A.2d 654, 658 (R.I.2010) (quoting *Lucier v. Impact Recreation, Ltd.*, 864 A.2d 635, 638 (R.I.2005)). "Further, a party 'opposing a motion for summary judgment has the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere allegations or denials in

the pleadings, mere conclusions or mere legal opinions.'" *Id.* (quoting *D'Allesandro v. Tarro,* 842 A.2d 1063, 1065 (R.I.2004)). Rule 56(e) of the Superior Court Rules of Civil Procedure states that this proof may be presented in the form of an affidavit "made on personal knowledge * * * set[ting] forth such facts as would be admissible in evidence, and * * * show[ing] affirmatively that the affiant is competent to testify to the matters stated therein."

 In an action for wrongful death, as in any negligence action, "a plaintiff must 'establish a standard of care as well as a deviation from that standard.'" *Boccasile v. Cajun Music Limited,* 694 A.2d 686, 689 (R.I.1997) (quoting *Sousa v. Chaset,* 519 A.2d 1132, 1135 (R.I.1987)); *see also Foley v. St. Joseph Health Services of Rhode Island,* 899 A.2d 1271, 1277 (R.I. 2006). Moreover, "[i]t is well-settled law in this jurisdiction that ' * * * it is the plaintiff's burden to establish that the defendant had a duty to act or refrain from acting and that there was a causal relation between the act or omission of the defendant and the injury to the plaintiff.'" *Foley,* 899 A.2d at 1277 (quoting *Schenck v. Roger Williams General Hospital,* 119 R.I. 510, 514, 382 A.2d 514, 516–17 (1977)).

 "Time and time again we have required 'expert testimony * * * to establish deviation from the standard of care when the lack of care is not so evident as to be obvious to a lay person.'" *Foley,* 899 A.2d at 1277 (quoting *Boccasile,* 694 A.2d at 690). With respect to a physician's alleged negligence, "[t]he expert must measure the care that was administered against the degree of care and skill ordinarily employed in like cases by physicians in good standing engaged in the same type of practice in similar localities." *Boccasile,* 694 A.2d at 690 (quoting *Richardson v. Fuchs,* 523 A.2d 445, 448 (R.I.1987)). "Likewise, '[w]here the alleged negligence

involves the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury.'" *Id.* (quoting *Ramage v. Central Ohio Emergency Services, Inc.,* 64 Ohio St.3d 97, 592 N.E.2d 828, 834 (1992)).

In this case, plaintiff asks the Court to disregard well-established Rhode Island precedent and adopt a judicially determined standard of care. Essentially, plaintiff asks that we establish the level of care that was reasonable under the circumstances, disregarding the need for expert testimony to establish the prevailing standard of care in the medical profession as well as a breach of that standard. The plaintiff suggests that defendants did not meet a reasonable standard of care in treating Mrs. Malinou, a patient with a documented history of dysphagia and at risk of aspiration.

We are not persuaded that the instant case is so unique that it would justify a departure from this state's clearly-defined precedent. The negligence alleged by plaintiff involves technical medical issues concerning the appropriate treatment of a patient with a documented history of dysphagia, who experienced respiratory failure allegedly caused by aspiration. The proper medical treatment of Mrs. Malinou's condition in this case "is not so evident as to be obvious to a lay person." *See Foley,* 899 A.2d at 1277 (quoting *Boccasile,* 694 A.2d at 690). Expert testimony, therefore, is necessary to establish both the applicable standard of care and a breach of that standard by defendants in order to sustain plaintiff's claims.

 The plaintiff also argues that his two expert witnesses who were not precluded from testifying, Nurse Buchanan

and Professor Tanner, would have been able to provide the requisite expert testimony to establish the applicable standard of care and a breach of that standard by defendants. He further contends that there are genuine issues of material fact about the elements of breach and causation.

At the hearing on defendants' motions for summary judgment, the trial justice, after reviewing all the evidence, including the depositions of Nurse Buchanan and Professor Tanner, concluded that plaintiff failed to establish, by competent medical expert testimony, that any of the defendants [13] deviated from the applicable standard of care in their treatment of Mrs. Malinou, or that any alleged deviation from the standard of care was the proximate cause of Mrs. Malinou's death. We agree.

The plaintiff's first expert, Nurse Buchanan, stated at her deposition that she was not qualified to testify about the standard of care for any of defendant physicians. With regard to defendant nurses, Nurse Buchanan testified that Nurse Brown actually met the standard of care. Further, Nurse Buchanan was unable to testify that Nurse LaManna did not meet the standard of care, although she "question[ed]" whether Nurse LaManna breached the standard of care. As for Nurse Asante, Nurse Buchanan testified that, up until the time that Mrs. Malinou was fed her lunch on January 13, 2003, Nurse Asante met the standard of care. Nurse Buchanan further testified, however, that before feeding Mrs. Malinou lunch, "Nurse Asante had a duty to consult with some other professional to determine whether or not [Mrs. Malinou] should be fed at [that]

time." Even if this testimony were sufficient to establish that Nurse Asante deviated from the standard of care, Nurse Buchanan nonetheless failed to offer any testimony establishing that the actions of Nurse Asante caused Mrs. Malinou to aspirate her lunch, thereby proximately causing her death.

Next, plaintiff's second expert, Professor Tanner, stated at his deposition that he was not able to testify that any of the individual defendant physicians or nurses breached the standard of care. Instead, Professor Tanner simply testified that he did not "believe the people involved met the standard of care for this particular patient." Professor Tanner believed that "Miriam Hospital somehow [was] deficien[t] in its practices" involving the care of Mrs. Malinou; however, Professor Tanner conceded that he was not familiar with the policies and procedures of the hospital and that his opinion on this issue was based merely on "what Mr. Malinou [had] told [him]." Even if this Court were to accept this extremely vague testimony of a speech pathologist as establishing the standard of care and a breach of that standard in the treatment of a patient with dysphagia, Professor Tanner's testimony is wholly insufficient to demonstrate that any such "deficiency" proximately caused Mrs. Malinou's death.

After conducting a *de novo* review of the trial justice's decision to grant summary judgment, we are satisfied that plaintiff has raised no genuine issue of material fact. The negligence alleged by plaintiff was not so evident as to be obvious to a lay person; thus, plaintiff's claim can be established only by expert testimony. We are satisfied that plaintiff failed to present suf-

---

**13.** With regard to Nurse Asante, the trial justice found that, although plaintiff might have carried his burden of proof on the issue of breach, he nonetheless failed to put forth expert testimony establishing that any alleged breach by Nurse Asante was the proximate cause of Mrs. Malinou's death.

ficient expert testimony to establish any deviation from an applicable standard of care and that he failed to show how any alleged deviations from the applicable standard of care proximately caused Mrs. Malinou's death. Accordingly, we conclude that summary judgment properly was granted in favor of all defendants on the medical negligence and wrongful death claims.

▆▆▆ The plaintiff also argues that Lifespan Corporation, which controlled the telephone communications systems at Miriam Hospital, should not be entitled to summary judgment because it knowingly destroyed records of telephone calls made by Miriam Hospital staff during Mrs. Malinou's admission at the hospital, in anticipation of litigation.[14] Although not explicitly articulated on appeal, plaintiff maintained at the summary judgment hearing that this amounted to spoliation of evidence. The doctrine of spoliation provides that "the deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavorable to that party." *Tancrelle v. Friendly Ice Cream Corp.*, 756 A.2d 744, 748 (R.I.2000). Even if the destruction of telephone records was deliberate or negligent, thus warranting such an unfavorable inference against Lifespan Corporation, in this jurisdiction we have recognized the doctrine of spoliation only as an evidentiary matter, which may warrant a jury instruction, but not as giving rise to an independent cause of action. *See, e.g., Mead v. Papa Razzi Restaurant*, 840 A.2d 1103, 1108–09 (R.I. 2004); *Tancrelle*, 756 A.2d at 748–49. Therefore, because plaintiff has failed to present sufficient expert testimony to establish a genuine issue of material fact as to his medical negligence claim, the doctrine of spoliation cannot operate to bar the otherwise proper entry of summary judgment in favor of Lifespan Corporation.

▆▆▆ Similarly, plaintiff's argument that he has a viable claim for negligent infliction of emotional distress and for loss of his mother's society and companionship under G.L.1956 § 10–7–1.2 of the Wrongful Death Act also must fail.[15] Although we recognize that a claim for loss of society and companionship is a separate and distinct cause of action, it is not an independent action but a derivative one that is "inextricably linked to the [impaired party's] underlying claims because their success depends on the success of those underlying claims." *Desjarlais v. USAA Insurance Co.*, 824 A.2d 1272, 1277 (R.I.2003); *see also Normandin v. Levine*, 621 A.2d 713, 716 (R.I.1993); *Sama v. Cardi Corp.*, 569 A.2d 432, 433 (R.I. 1990). Further, this Court has stated that a claim for loss of society and companionship depends on the injured party's ability to recover in a claim against the

---

**14.** The record indicates that Lifespan Corporation's policy was to maintain records of telephone calls within its system for three years, after which time the information is recorded over. It is also noted in the record that "backup tapes" of the telephone records at issue were identified and sent to a data forensics center for analysis; however, those tapes contained no meaningful data because they had been "overwritten."

**15.** General Laws 1956 § 10–7–1.2(b) provides: "Whenever the death of a parent or parents of a son or daughter shall be caused by the wrongful act, neglect or default of another person, the son or daughter may recover damages against the person for the loss of parental society and companionship." We also note that, at the time plaintiff filed his complaint, § 10–7–1.2(b), as amended by P.L. 1984, ch. 64, § 2, provided that only "an unemancipated minor" could recover damages for loss of parental society and companionship. Section 10–7–1.2(b) was amended in 2010, by P.L.2010, ch. 240, § 1, to allow any "son or daughter" to recover such damages.

same defendant. *Desjarlais*, 824 A.2d at 1277; *see also Fiorenzano v. Lima*, 982 A.2d 585, 591 (R.I.2009). Likewise, to have a viable claim for negligent infliction of emotional distress, a plaintiff first must prove by competent evidence that the alleged injury is the result of a negligent act of a defendant. *See Swerdlick v. Koch*, 721 A.2d 849, 864 (R.I.1998). In this case, plaintiff failed to present sufficient evidence to support his underlying claims for medical negligence and wrongful death; thus, plaintiff does not have a viable claim for negligent infliction of emotional distress or for loss of society and companionship.

### 2. Loss–of–Chance Doctrine

The plaintiff further contends that the doctrine of loss of chance should apply in this case to establish the element of causation in his medical negligence claims.[16] The loss-of-chance doctrine differs from traditional negligence in that it provides "a more liberal and expansive view of causation"; however, it does not create a distinct cause of action. *Contois v. Town of West Warwick*, 865 A.2d 1019, 1023 (R.I.2004); *see also Mandros v. Prescod*, 948 A.2d 304, 310 (R.I.2008). "Loss of chance occurs when 'the defendant's negligent conduct caused the plaintiff to lose a chance to avoid the ultimate harm.'" *Contois*, 865 A.2d at 1023 (quoting *Mead v. Adrian*, 670 N.W.2d 174, 186 (Iowa 2003) (Cady, J., concurring specially)). Under this doctrine, "[i]t remains necessary for a plaintiff * * * to first establish a duty and breach of that duty." *Id.* "However, rather than prove that the breach of duty proximately caused the harm, the plaintiff need only establish that '[the] defendant's negligence was a proximate cause of the

lost chance'" for a better outcome. *Id.* (quoting *Mead*, 670 N.W.2d at 186).

It is plaintiff's position that the decision to withdraw life support from Mrs. Malinou, without first conducting a neurological examination to determine the extent of her brain damage, caused Mrs. Malinou to lose a chance to survive. The plaintiff also contends that Mrs. Malinou lost a chance to survive when Miriam Hospital and defendant nurses failed to secure an examination of Mrs. Malinou by a physician during the overnight hours of January 12 to 13, 2003. The plaintiff argues that an examination would have indicated that Mrs. Malinou should not have been fed by mouth on the morning of January 13, 2003.

Even according to the more expansive view of causation under the loss-of-chance doctrine, however, a plaintiff still "has the obligation to present evidence that the alleged negligence was a proximate cause of the loss of chance." *Foley*, 899 A.2d at 1281. As discussed *supra*, plaintiff in this case failed to submit any competent evidence on the element of causation in support of his medical negligence claim. Based on the absence of any evidence tending to prove that the alleged negligence caused Mrs. Malinou to lose a chance to survive, we conclude that, even if we were to adopt the loss-of-chance doctrine, it would not preclude the entry of summary judgment in favor of defendants.

### 3. Death Certificate

Finally, plaintiff alleges that Dr. Siddall–Bensson prepared and signed a death certificate containing false informa-

---

**16.** We note that, although this Court has acknowledged the existence of the loss-of-chance doctrine, it has never adopted the doctrine. *See, e.g., Mandros v. Prescod*, 948 A.2d 304, 310–11 (R.I.2008); *Contois v. Town of West Warwick*, 865 A.2d 1019, 1023–25 (R.I.2004).

tion, in violation of G.L.1956 § 11–18–1,[17] because she failed to indicate aspiration as a possible cause of death and failed to indicate the "suspicion of accident." [18] As a result, plaintiff asserts, no autopsy was performed and plaintiff was injured by "spoliation of evidence in the form of autopsy results which were not obtained." Although § 11–18–1 does not set out a private cause of action for the filing of a false death certificate, plaintiff argues that he has a viable cause of action created by G.L.1956 § 9–1–2 for persons injured by the commission of a crime.[19] In response, Dr. Siddall–Bensson contends that a private cause of action cannot be inferred when not clearly provided for in § 11–18–1, and, even if a private cause of action existed, plaintiff failed to present any competent evidence in support of his allegation that the death certificate contained false information.

The laws governing the preparation of a death certificate require a physician to "stat[e] to the best of his or her knowledge and belief * * * the disease of which [the deceased] died * * *." General Laws 1956 § 23–3–16(c). Additionally, a physician is required by law to report to the state medical examiner's office any death that occurred in an "unusual manner" or in any "unnatural manner, or as the apparent result of the negligence of another person." Section 23–4–7(a)(1), (c). After carefully reviewing the record in this case, we find no evidence indicating that Dr. Siddall–Bensson reported any false information or violated any law in preparing Mrs. Malinou's death certificate. The death certificate lists respiratory failure caused by pneumonia as the cause of death. In her answers to interrogatories, Dr. Siddall–Bensson stated that the death certificate accurately reflects the cause of death. She further stated that Mrs. Malinou's death was not caused by an accident. The plaintiff has failed to establish by competent evidence that Mrs. Malinou's death was caused by aspiration or by any other condition not listed on the death certificate. Moreover, plaintiff has failed to present sufficient evidence showing any "suspicion of accident" or that Mrs. Malinou's death occurred in an "unusual manner" or in any "unnatural manner, or as the apparent result of the negligence of another person."

We conclude that the plaintiff has raised no genuine issue of material fact showing that Dr. Siddall–Bensson filed a false death certificate in violation of § 11–18–1.[20] Therefore, we are satisfied that summary judgment in favor of Dr. Siddall–Bensson was properly granted on this count.

### III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior

---

**17.** General Laws 1956 § 11–18–1(a) prohibits the filing of a false document with a public official, providing in pertinent part: "No person shall knowingly give to any * * * public official any * * * document * * * which contains any statement which is false or erroneous * * * and which, to his or her knowledge, is intended to mislead the * * * state, city, or town of which he or she is an official."

**18.** The instructions printed on the death certificate provide that a death must be referred to the medical examiner if "[d]eath is due to, or there is a suspicion of accident."

**19.** General Laws 1956 § 9–1–2 provides in pertinent part: "Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender * * *."

**20.** Accordingly, we need not address the issue of whether § 9–1–2 sets out a private cause of action for an alleged violation of § 11–18–1.

Court. The record may be returned to the Superior Court.